

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 29, 2023**

_____
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| **SENIOR CARE CENTERS, LLC, et al.** | § | **BANKR. CASE NO. 18-33967-sgj11** |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| ------------------------------------------------------ | § | |
| | § | |
| **ALAN D. HALPERIN, as Unsecured** | § | |
| Creditor Trustee | § | |
| | § | |
| Plaintiff. | § | **Adv. Pro. No. 20-03178-sgj** |
| | § | |
| v. | § | **Civ. Act. No. 3:21-cv-01498-B** |
| | § | |
| **ERIC WILLS, as TRUSTEE of the** | § | |
| **WILLS REVOCABLE LIVING TRUST,** | § | |
| **and ERJMJ INVESTMENTS, LP** | § | |
| | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT: (I) WITH RESPECT TO THE MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING "BRIDGE LOAN TRANSFER," IT (A) GRANT SUMMARY JUDGMENT OF NO LIABILITY ON ALL FRAUDULENT TRANSFER COUNTS; BUT (B) DENY SUMMARY JUDGMENT AS TO PREFERENCE COUNTS; AND (II) WITH RESPECT TO "DIVIDEND TRANSFERS," IT GRANT MOTION TO DISMISS AS TO ALL COUNTS FOR LACK OF STANDING/SUBJECT-MATTER JURISDICTION**

I.      **Introduction**

The above-referenced adversary proceeding ("Action") stems from the Chapter 11 bankruptcy case of Senior Care Centers, LLC ("SCC") and more than 100 of its subsidiaries (collectively, the "Debtors").  The Debtors operated skilled nursing homes and related assets.  The plaintiff in the Action is Alan D. Halperin, a post-confirmation trustee (the "Plaintiff or "Trustee") of a litigation trust established for the benefit of general unsecured creditors (the "GUC Trust"). The GUC Trust was established pursuant to the terms of a confirmed *Third Amended Joint Plan of Reorganization Filed under Chapter 11 of the Bankruptcy Code* ("Plan")[1] for the Debtors.  The Trustee seeks to avoid and recover certain prepetition payments made by the Debtor SCC to the two defendants herein as either fraudulent or preferential transfers.  As later explained, the targeted transfers fall into two buckets: (a) a transfer (or repayment) of a so-called "Bridge Loan" (in the amount of $5,221,232.88); and (b) certain "Dividend Transfers" (aggregating $1,064,433.26 in amount).

This Action is governed by an *Order Accepting Report and Recommendation of the United States Bankruptcy Judge,* entered by the district court  ("District Court"), Judge Jane Boyle, accepting the bankruptcy court's earlier recommendation regarding a motion to withdraw the reference that was filed by the defendants, such that the reference of this Action will be withdrawn when the bankruptcy court certifies to the District Court that it is ready for trial but, meanwhile, "all pretrial matters in this adversary proceeding [are referred] to the bankruptcy court for resolution, including ruling on dispositive motions."   Accordingly, the bankruptcy court now submits this report and recommendation to the District Court regarding two dispositive motions that are now pending: (1) a Motion for Partial Summary Judgment and brief in support ("MPSJ")

---

[1] *See* Bankr. Dkt. No. 2053.

[Adv. Dkt. Nos. 57, 58][2] filed by one defendant, Eric Wills, as trustee of the Wills Revocable Living Trust (the "Wills Trust"), and (2) a later-filed Motion to Dismiss for Lack of Subject Matter Jurisdiction and brief in support ("MTD") [Adv. Dkt. Nos. 75, 76] filed by both the Wills Trust and the related defendant ERJMJ Investments, LP ("ERJMJ" and, with the Wills Trust, "Defendants"). The odd procedural posture of there being a motion to dismiss filed by Defendants *after* a motion for summary judgment by one Defendant will be explained later herein (the short answer is that the MTD relates to a possible lack of standing/subject matter jurisdiction as to the counts pertaining to the Dividend Transfers in the Action—and, obviously, lack of subject matter jurisdiction can be raised at any time).

Notably, this Action is one of eleven, similar bankruptcy avoidance actions (the "Related Avoidance Actions") that were simultaneously filed by the Trustee regarding what has been described as the prepetition "Bridge Loans."[3] What were the Bridge Loans? Specifically, the defendants in each of the eleven Related Avoidance Actions—including the Wills Trust Defendant in this Action—made certain short-term loans ("Bridge Loans") in October and/or December of 2017 to a non-debtor entity known as Granite Investment Group, LLC ("Granite"), which was the indirect majority owner of the Debtor SCC. The express purpose of the Bridge Loans was to allow the parent Granite to provide immediately needed working capital *to SCC*—in other words, the loan proceeds would go to SCC, even though SCC was not itself the actual borrower under the

---

[2] Citations to docket entries in the instant adversary proceeding shall be notated as follows: Adv. Dkt. No. __ ; citations to docket entries in the main bankruptcy case shall be notated as follows: Bankr. Dkt. No. __.

[3] The ten other Related Avoidance Actions are: *Halperin v. Dalman*, Adv. Pro. 20-3177-sgj (the "Dalman Action"); *Halperin v. LeWinter*, Adv. Pro. 20-3179-sgj (the "LeWinter Action"); *Halperin v. Julian and Alleen Movsesian*, Adv. Pro. 20-3180-sgj (the "Movsesian Action"); *Halperin v. Luke*, Adv. Pro. 20-3178-sgj (the "Luke Action"); *Halperin v. The Neuman Foundation, Inc.*, Adv. Pro. 20-3182-sgj (the "Neuman Action"); *Halperin v. Osman and Denise Castillo*, Adv. Pro. 20-3183-sgj (the "Castillo Action"); *Halperin v. Schmonk Limited*, Adv. Pro. 20-3184-sgj (the "Schmonk Action"); *Halperin v. Habing*, Adv. Pro. 20-3185-sgj (the "Habing Action"); *Halperin v. Yadah, Yadah, Yadah, LLC*, Adv. Pro. 20-3186-sgj (the "Yadah Action"); and *Halperin v. Zeitgeist, LLC*, Adv. Pro. 20-3187-sgj (the "Zeitgeist Action").

Bridge Loans.  At the time, SCC badly needed working capital to pay for its ongoing operations, pending an anticipated sale of certain of its pharmacy assets ("Pharmacy Sale"), which sale was being pursued by SCC to address its liquidity needs. The funds lent under the Bridge Loans—on which Granite was the borrower—were sent directly by the Bridge Lenders[4] to an SCC account, and then SCC used the funds to pay operating expenses.  This allowed SCC to stay in business long enough to close on the Pharmacy Sale in February 2018. Soon thereafter—out of the proceeds of the Pharmacy Sale—SCC transferred directly to most of the Bridge Lenders,[5] including the Defendant Wills Trust in this Action, the amounts necessary to repay the obligations under all of the outstanding Bridge Loans (the "Bridge Loan Transfers").  The repayment of the Bridge Loans happened approximately nine months before SCC ultimately filed Chapter 11 bankruptcy.

Unlike the other Related Avoidance Actions, this Action also involves other transfers of funds, besides the Bridge Loan Transfer—specifically dividends.  Specifically, SCC also made a series of pre-petition dividend payments ("Dividend Transfers") to the Defendants herein, in the years leading up to its bankruptcy filing.  The court notes that—although the Trustee has alleged that all of the Bridge Lender Defendants in the Related Avoidance Actions were insiders of SCC, and that a number of them held Class A membership interests in SCC (and, presumably, may have received dividend payments from SCC on account of their membership interests at the same time the Defendants herein received their Dividend Transfers)—the Trustee did ***not*** seek to avoid any dividend payments to any of the other defendants in the Related Avoidance Actions.

---

[4] The defendants in each of the Related Avoidance Actions shall be referred to, collectively, as "Bridge Lenders" or "Bridge Lender Defendants" and, individually, as a "Bridge Lender" or "Bridge Lender Defendant," except for defendant ERJMJ in this Action, which was neither a Bridge Lender nor the recipient of a Bridge Loan Transfer from SCC.

[5] There were two Bridge Lenders who were paid off before the Pharmacy Sale, in December 2017.

In Counts I through VI of the Complaint in this Action—and in each of the Related Avoidance Actions—the Trustee has sought to avoid, pursuant to the Bankruptcy Code and applicable Texas state law, the Bridge Loan Transfers to the various Bridge Lender Defendants as: (a) constructive fraudulent transfers, on the basis that the Bridge Loan Transfers were not made by SCC in exchange for reasonably equivalent value; (b) actual fraudulent transfers made by SCC with the actual intent to hinder, delay, or defraud its creditors; and/or (c) preferential transfers made to an insider of SCC—as alleged repayment of antecedent debt to insiders of SCC made more than ninety days and less than one year prior to SCC's bankruptcy filing.

In each of the Related Avoidance Actions, the respective Bridge Lender Defendants sought withdrawal of the reference of their Related Avoidance Actions to the District Court—each time triggering the creation of a separate civil action in the District Court, with separate civil action numbers, and separate judges.[6]   The bankruptcy court recommended that the reference be withdrawn in all of these (with the bankruptcy court handling pre-trial matters).   Each Bridge Lender Defendant also filed a motion for summary judgment ("MSJ") in every single Related Avoidance Action, seeking judgment against the Trustee as to all counts relating to the Bridge Loan Transfers.   Hearings on the various Bridge Lenders' MSJs in each of the Related Avoidance Actions were set for oral argument in the bankruptcy court over the course of several months.   The bankruptcy court issued its first report and recommendation on the earliest-argued MSJ—the one in the Neuman Action—recommending to the District Court (Senior District Judge Sam

---

[6] These civil actions (designated by the Defendant named therein) and the judges assigned were as follows: the Dalman Action and Castillo Action—like the current Action—were assigned to Judge Boyle as Civ. Act. No. 3:21-cv-01334-B and Civ. Act. No. 3:21-cv-01374-B, respectively. The Movsesian Action, the Luke Action, and the Habing Action were assigned to Judge Brown as Civ. Act. No. 3:21-cv-01336-E, Civ. Act. No. 3:21-cv-01337-E, and Civ. Act. No. 3:21-cv-01376-E, respectively.  The Yadah Action and Zeitgeist Action were assigned to Judge Lindsay as Civ. Act. No. 3:21-cv-01377-L and Civ. Act. No. 3:21-cv-01297-L, respectively. The LeWinter Action was assigned to Judge Lynn as Civ. Act. No. 3:21-cv-01335-M. The Schmonk Action was assigned to Judge Starr as Civ. Act. No. 3:21-cv-01375-X. The Neuman Action was assigned to Senior Judge Cummings as Civ. Act. No. 3:21-cv-01357-C.

Cummings in that action) that he grant the Neuman MSJ and order that the Trustee's claims against the Bridge Lender Defendant Neuman be dismissed and that Neuman have "no liability as to all counts in the complaint." On May 8, 2023, Judge Cummings adopted the bankruptcy court's report and recommendation and entered a judgment in favor of the Bridge Lender Defendant Neuman.

Thereafter, the Trustee informed the bankruptcy court that the parties would be entering into stipulations of dismissal, with prejudice, as to all other Related Avoidance Actions *except for this Action*, and on June 16, 2023, a *Stipulation of Dismissal* was filed in each of the remaining Related Avoidance Actions except for this Action. Thus, this Action is the only remaining action of the original, eleven Related Avoidance Actions.

To be sure, this Action is slightly different from the other Related Avoidance Action in that: (a) the "insider" status of the Defendants is more vexing than it was for the other Bridge Lender Defendants; and (b) this Action, as noted earlier, also seeks to avoid Dividend Transfers, in addition to a Bridge Loan Transfer.

Insider-ness with regard to the Wills Trust and its Bridge Loan Transfer. A hearing on the Wills Trust MPSJ was held on July 27, 2023, during which arguments focused on whether the Wills Trust was a statutory or non-statutory insider of SCC, a necessary element of the Trustee's insider preference causes of action in Counts V and VI of the Complaint, and perhaps also relevant to the Trustee's actual fraudulent transfer causes of action.

The Dividend Transfers. A separate hearing was held on the MTD on August 15, 2023. The MTD dealt only with the Dividend Transfers. As noted, in this Action, unlike in the other Related Avoidance Actions, the Trustee also has sought (in Counts I through IV of his Complaint), to avoid Dividend Transfers made by SCC to both Defendants between December 30, 2015, and

March 31, 2018, totaling $1,064,433.26[7] as (a) constructive fraudulent transfers, on the basis that

the Dividend Transfers were not made by SCC in exchange for reasonably equivalent value, and

(b) actual fraudulent transfers made by SCC with the actual intent to hinder, delay, or defraud its

creditors.  Why was the MTD filed so late?  It came about after the bankruptcy court questioned

in two of the Related Avoidance Actions (the Dalman Action and the Movsesian Action) whether

certain causes of action as to those defendants had been retained, preserved, and transferred to the

GUC Trust pursuant to the confirmed Plan or, perhaps, had been waived and released upon the

occurrence of the effective date of the Plan.  The Dalman Action and Movsesian Action were

thereafter dismissed by stipulation.  The Defendants herein filed their MTD shortly thereafter,

apparently perceiving that Counts I through IV herein ***relating to the Dividend Transfers*** might

have the same defect raised by the court in the Dalman and Movsesian Actions—i.e., now arguing

that, under the terms of the Plan, the Debtors' causes of action for the avoidance and recovery of

the Dividend Transfers were not retained, preserved, and transferred to the GUC Trust by the

Debtors but were waived and released upon the occurrence of the effective date of the Plan.

## II.      Some Relevant Background Regarding SCC and its Bankruptcy Filing

The Debtor, SCC, was formed on November 20, 2008, by an entity known as Silver Star

Investments, LLC ("Silver Star").  As part of SCC's formation, Silver Star:  (a) raised $12.5 million

of SCC's initial capital from outside investors, through the issuance and sale of Class A

membership interests, representing 25% of the total equity interests in SCC, while (b) contributing

$1 million in initial funding itself, in exchange for Class B Units, representing 75% of the total

equity interests in SCC at its initial capitalization.  SCC commenced operations on May 1, 2009,

as a licensed operator of fourteen (14) skilled nursing facilities ("SNFs").   In 2016, SCC made a

---

[7] SCC made over $760,000 in Dividend Transfers to ERJMJ and over $304,000 in Dividend Transfers to "Wills."

nearly $20 million equity offering "to provide additional working capital and to assist [SCC] in its continued growth."[8]  SCC grew significantly between 2009 and 2018, and eventually became—together with over 120 wholly owned subsidiaries—one of the largest providers of skilled nursing care in the country and the largest operator of SNFs in Texas.  As of the Petition Date (defined below), SCC operated approximately ninety-seven (97) SNFs, nine (9) assisted living facilities, and six (6) hospice facilities located throughout Texas and Louisiana and employed approximately 11,300 individuals.  Class A members held approximately 31.7% of the total equity in SCC, and Silver Star held approximately 68.3% of SCC's total equity.  The entity known as Granite—which was in the middle of the Bridge Loans at issue in this Action—owned approximately 73.5% of Silver Star and was, thus, SCC's indirect majority owner.

The Debtors did not own any real estate but, instead, operated all of their facilities through leases with numerous landlords.  As of the Petition Date, SCC or one of its affiliate Debtors was party to approximately 113 leases.  Granite, through a series of separate companies formed by it (the "Granite Landlords"), was the landlord with respect to 34 of these facility leases.  One might fairly say Granite wore many "hats" with regard to the Debtors' structure and operations.

SCC, along with most of its wholly owned subsidiaries, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 4, 2018 (the "Petition Date").[9]  An Official Committee of Unsecured Creditors ("UCC") was appointed by the United States Trustee on December 14, 2018.  On October 16, 2019, the Debtors and the UCC filed the Plan and the

---

[8] *See Disclosure Statement for the Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Bankr. Dkt. No. 2054].

[9] Eight additional Debtors in these jointly administered cases filed petitions for relief under chapter 11 on January 28, 2019 or May 20, 2019.

Disclosure Statement.  The Plan was confirmed by the bankruptcy court on December 13, 2019,[10] and the effective date ("Effective Date") of the Plan occurred on March 27, 2020.[11]  Under the terms of the Plan, certain of the Debtors' preference and fraudulent transfer causes of actions ("UCT Avoidance Actions") were transferred to the GUC Trust (sometimes referred to as the "UCT") to be prosecuted for the benefit of the holders of general unsecured claims under the Plan, while some of the Debtors' avoidance actions were waived and released ("Waived Avoidance Actions") as of the Effective Date.[12]  To the extent that this Action involves the Trustee's attempt to avoid and recover *the Bridge Loan Transfer to the Wills Trust*, it is undisputed that the Debtors' causes of action against the Wills Trust as a Bridge Lender and the specific dollar amount of the Bridge Loan Transfer were explicitly identified in the Debtors' and the UCC's *Notice of Filing of Plan Supplement* ("Plan Supplement") [Bankr. Dkt. No. 2219] filed on November 19, 2019,[13] as UCT Avoidance Action(s) that were transferred to the UCT pursuant to Article VI(E) of the Plan.  As will be discussed in greater detail below in connection with the court's consideration of the Defendants' MTD, the Plan is far from clear, however, regarding whether the Trustee's causes of action in Counts I through IV of the Complaint *against the Wills Trust and ERJMJ for avoidance and recovery of the Dividend Transfers* would constitute UCT Avoidance Actions that would have been transferred to the UCT under the Plan or, in contrast, Waived Avoidance Actions that would have been waived and released by the Debtors as of the effective date of the Plan.

---

[10] *See Findings of Fact, Conclusions of Law, and Order Confirming Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Bankr. Dkt. No. 2376].

[11] *See Notice of (I) Entry of Findings of Fact, Conclusions of Law, and Order Confirming Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, (II) Occurrence of the Effective Date, and (III) Bar Date Notice for Rejection Damages Claims, Administrative Expense Claims and Professional Fee Claims* [Bankr. Dkt. No. 2659].

[12] Upon the occurrence of the Effective Date, the Debtors were substantively consolidated such that, among other things, the assets of the UCT, including the UCT Avoidance Actions and the proceeds thereof, and all liabilities of each of the Debtors were deemed merged into and with the liabilities and assets of each other.

[13] *See* Bankr. Dkt. No. 2219, Exhibit K Schedule of Unsecured Creditor Trust Causes of Action, at 176-177, 182.

On December 2, 2020, the Trustee commenced the eleven Related Avoidance Actions against the Bridge Lenders in the bankruptcy court.  The instant Action was initiated by the filing of a complaint ("Complaint") [Adv. Dkt. No. 1] against the Defendants in which the Trustee asserts causes of action for avoidance and recovery of the Bridge Loan Transfer made by SCC to the Wills Trust on February 5, 2018, in the amount of $5,221,232.88, as fraudulent and preferential transfers (Counts I-VI), and for avoidance and recovery of the $1,064,433.26 of Dividend Transfers made by SCC to the Wills Trust and ERJMJ, on various dates prior to the Petition Date, as fraudulent transfers (Counts I-IV):

- **Count I – <u>Constructive Fraud</u> (Bankruptcy Code §§ 544(b) and 550 and Tex. Bus. & Com. Code § 24.005(a)(2) of the Texas Uniform Fraudulent Transfer Act ("<u>TUFTA</u>"))** - avoidance and recovery of the *Bridge Loan Transfer and the Dividend Transfers* made within four years of the Petition Date as constructively fraudulent under Bankruptcy Code §§ 544(b) and 550 and TUFTA § 24.005(a)(2);

- **Count II – <u>Actual Fraud</u> (Bankruptcy §§ 544(b), 550, 551 and TUFTA § 24.005(a)(1))** - avoidance and recovery of the *Bridge Loan Transfer and the Dividend Transfers* made within four years of the Petition Date under an actual fraud theory pursuant to Bankruptcy Code §§ 544(b), 550 and 551 and TUFTA § 24.005(a)(1);

- **Count III – <u>Actual Fraud</u> (Bankruptcy Code §§ 548(a)(1)(A) and 550)** - avoidance and recovery of the *Bridge Loan Transfer and the Dividend Transfers* made within two years of the Petition Date under an actual fraud theory pursuant to Bankruptcy Code §§ 548(a)(1)(A) and 550;

- **Count IV – <u>Constructive Fraud</u> (Bankruptcy Code §§ 548(a)(1)(B) and 550)** - avoidance and recovery of the *Bridge Loan Transfer and the Dividend Transfers* made within two years of the Petition Date as constructively fraudulent under Bankruptcy Code §§ 548(a)(1)(B) and 550;

- **Count V – <u>Insider Preference</u> (Bankruptcy Code §§ 544(b) and 550 and TUFTA § 24.006(b))** – avoidance and recovery of *the Bridge Loan Transfer only* as a preferential transfer to an insider of SCC under Bankruptcy Code §§ 544(b) and 550 and TUFTA § 24.006(b);

- **Count VI – <u>Insider Preference</u>** (Bankruptcy Code §§ 547 and 550) - avoidance and recovery of ***the Bridge Loan Transfer only*** as a preferential transfer to an insider of SCC under Bankruptcy Code §§ 547 and 550.

On April 28, 2021, the Defendants filed their *Original Answer and Third-Party Claim* ("<u>Answer</u>") [Adv. Dkt. No. 24], in which they:  (i) denied liability on each of the causes of action; (ii) asserted affirmative defenses under Bankruptcy Code sections 547(c)(2) and 550(b), (c), and (d), and under TUFTA section 24.009(a) and (f); and (iii) asserted a third-party claim against Granite, for breach of its promissory note issued to the Wills Trust, in the event the Trustee avoids and recovers the Bridge Loan Transfer.

On May 28, 2021, Defendants filed their *Motion to Withdraw the Reference*[14] ("<u>MTWR</u>") pursuant to 28 U.S.C. § 157(d), Federal Rule of Bankruptcy Procedure 5011, and Local Bankruptcy Rule 5011-1(a).  As alluded to earlier, on July 15, 2021, the bankruptcy court issued its *Report & Recommendation to District Court Proposing That It: (A) Grant the Pending Motion to Withdraw the Reference at Such Time as the Bankruptcy Court Certifies That Litigation Is Trial Ready; and (B) Defer to Bankruptcy Court the Handling of All Pretrial Matters* ("<u>R&R MTWR</u>") [Dkt. No. 32].[15]  The MTWR was assigned Civil Action No. 3:21-cv-01498-B (District Judge Jane Boyle).  On August 2, 2021, Judge Boyle entered an order, accepting the R&R MTWR and withdrawing the reference to the bankruptcy court "for the purpose of trial" but otherwise "refer[ring] all pretrial matters in this adversary proceeding to the bankruptcy court for resolution, including ruling on dispositive motions," and providing that "[t]he bankruptcy court shall certify

---

[14] *See* Adv. Dkt. No. 29.
[15] *See* Adv. Dkt. No. 35.

to this Court when this case is ready for trial" and ordering the parties "to notify this Court if at any time they settle this matter before the bankruptcy court's certification."[16]


### III.    Defendant Wills Trust's Motion for Partial Summary Judgment

The Wills Trust filed its MPSJ on June 15, 2022, with an attached 95-page appendix,[17] seeking a partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing each of the six counts set forth in the Complaint with respect to the Bridge Loan Transfer,[18] alleging that the Trustee cannot establish one or more essential elements with respect to his constructive fraudulent transfer claims, actual fraudulent transfer claims, and preferential transfer claims, and that the Trustee cannot show that there is a genuine dispute of material fact with respect to the Wills Trust's "ordinary course of business" affirmative defense to the Trustee's preference claim under Bankruptcy Code § 547. Specifically, the Wills Trust seeks summary judgment on the bases that: (1) with respect to the ***constructive*** fraudulent transfer claims (Counts I and IV) regarding the Bridge Loan Transfer, the Trustee is unable to point to evidence that SCC did not receive reasonably equivalent value in exchange for the Bridge Loan Transfer; (2) with respect to the ***actual*** fraudulent conveyance claims (Counts II and III) regarding the Bridge Loan Transfer, the Trustee is unable to present evidence that the Bridge Loan Transfer was made by SCC with the intent to hinder, delay, or defraud creditors of SCC; and (3) with respect to the insider

---

[16] DCT Dkt. No. 4.

[17] References to the Wills Trust's appendix shall be made as follows:  Def. Ex. __, Appx. __.

[18] As noted, the Wills Trust seeks a partial summary judgment only as to the Trustee's causes of action seeking to avoid the Bridge Loan Transfer made to the Wills Trust; ERJMJ is not a movant with respect to the MPSJ because ERJMJ was not a Bridge Lender and so did not receive a Bridge Loan Transfer from SCC.  Neither the Wills Trust nor ERJMJ, who were both alleged to have received Dividend Transfers from SCC, seek a summary judgment with respect to the Trustee's Dividend Transfer causes of action (asserted in Counts I through IV of the Complaint), but both Defendants seek a dismissal of the Dividend Transfer causes of action for lack of subject matter jurisdiction in their MTD.

preference claims, the Trustee is unable to identify evidence that (a) the Wills Trust was an insider of SCC at the time of the Bridge Loan Transfer (Counts V and VI), (b) the Bridge Loan Transfer was not made in the ordinary course of business between SCC and the Wills Trust (Counts V and VI), and (c) the Wills Trust had reasonable cause to believe SCC was insolvent on the date of the Bridge Loan Transfer (Count V).

On August 8, 2022, the Trustee filed his *Response in Opposition to Defendants' Motion for Partial Summary Judgment and Brief in Support* ("Opposition"), with an attached 1095-page appendix,[19] in which he opposed the MPSJ on the bases that (1) with respect to his constructive fraudulent transfer claims (Counts I and IV), he has shown that SCC did not receive reasonably equivalent value in exchange for the Bridge Loan Transfer (by arguing that the debt between SCC and Granite was unenforceable at the time of the Bridge Loan Transfer under the California Statute of Frauds and that the "purported" loan from Granite to SCC was actually an equity injection by Granite into SCC, the repayment of which cannot support a finding of reasonably equivalent value); (2) with respect to his actual fraudulent transfer claims (Counts II and III), he has shown the existence of "badges of fraud" that, in turn, would show actual intent by SCC to hinder, delay, or defraud its creditors under TUFTA and Bankruptcy Code § 548(a)(1); and (3) with respect to his preference claims, he has pointed to evidence that (a) the Wills Trust was an insider of SCC at the time of the Bridge Loan Transfer (Counts V and VI), (b) the Bridge Loan Transfer was not made in the ordinary course of business between SCC and the Wills Trust (Counts V and VI), and (c) the Wills Trust had reasonable cause to believe SCC was insolvent on the date of the Bridge Loan Transfer (Count V).

---

[19] References to the Trustee's appendix shall be made as follows:  Pl. Ex. __, Appx. __.

On September 1, 2022, the Wills Trust filed its *Reply in Support of Its Motion for Summary Judgment and Brief in Support* ("Reply").[20]

On July 27, 2023, the bankruptcy court heard oral arguments on the MPSJ and the Trustee's opposition thereto.

### A. Undisputed Facts

### 1. The Defendant Wills Trust's Relationship to SCC

Under its company operating agreement ("Operating Agreement"), SCC's equity interests were divided into three classes: Class A, Class B, and Class C. Pl. Ex. A, Declaration of John D. Elrod in Support of Plaintiff's Opposition to Motion for Summary Judgment (the "Elrod Decl."), Ex. 3, Operating Agreement, § 8.5, Appx. 229.  Class A unit holders had priority over Class B and Class C unit holders as to the return of capital contributions and distributions. *Id.*  SCC's largest equity owner was Silver Star, which owned a majority of the Class B units. Pl. Ex. E, Excerpt of Deposition Transcript of Michael S. Rickard as Rule 30(b)(6) Representative of Granite, dated Feb. 14, 2022 ("Rickard 30(b)(6) Dep."), 106:4-7, Appx. 436; Pl. Ex. B, Kerr Dep., 16:2-3, Appx. 286.  Class A and Class B unit holders had voting rights under the terms of the Operating Agreement. Pl. Ex. A, Elrod Decl., Ex. 3, Operating Agreement, §§ 5.5 and 5.6.  Granite owned approximately 73.5% of Silver Star and, thus, had an indirect equity interest in SCC, but Granite never owned any equity interests of SCC. Disclosure Statement, at 2.  Granite, in its capacity as the indirect majority owner of SCC through its ownership of Silver Star, directed the appointment of three of five members of SCC's board of directors:  Granite's founder, Allen Boerner ("Boerner"), and two long-time Granite officers, Scott Rickard ("Rickard") and John Heller ("Heller").  The other two members of the board were Andrew Kerr ("Kerr"), who was SCC's

---

[20] Adv. Dkt. No. 63.

Chief Financial Officer ("CFO") and later President, and Alan Munday, a former employee of Granite. SCC's Class A units were held by individual investors, including several of the Bridge Lenders. Pl. Ex. D, Excerpt of Deposition Transcript of Michael S. Rickard dated Oct. 27, 2021 ("Rickard Dep."), Appx. 408-409.

The Wills Trust does not dispute that it (and not its trustee Eric Wills, individually) "at one time owned a portion of the Class A shares of [SCC] . . . . representing less than 5% of the total shares of the company," Def. Ex. A, Declaration of Eric Wills, As Trustee of The Wills Revocable Living Trust ("Wills Decl."), ¶5, Appx. 4. Eric Wills states in his declaration that the Wills Trust's Class A interests in SCC were "sold prior to the making of the loan at issue." *Id*. But, the Wills Trust has not pointed to any record evidence, other than Eric Wills' statement in his declaration, that the Wills Trust sold its interests in SCC prior to making the Bridge Loan. On the other hand, the Trustee has pointed to some record evidence that the Wills Trust was an equity interest holder in SCC at the time the Bridge Loan was made in December 2017. *See* Pl. Ex. D, Rickard Dep., Ex. 4, Appx. 408 (which is a list of SCC equity members as of 12/31/2017, showing the Wills Trust as having an equity interest in SCC as of that date). Both the Wills Trust and ERJMJ—which Eric Wills also controls—admitted in their Answer to having received a series of Dividend Transfers from SCC between December 30, 2015 and March 31, 2018. *See* Answer ¶26 (in which the Defendants (plural) admit "that the dividend transfers listed in paragraph 26 [of the Complaint] were made to the Defendant*s*" (emphasis added), where Paragraph 26 of the Complaint identifies "ERJMJ Dividend[s]" and "Wills Dividend[s]" as the Dividend Transfers made to the Defendants by SCC that the Trustee seeks to avoid as fraudulent transfers in Counts I through IV of the Complaint).

The Wills Trust was one of two of the Bridge Lender Defendants in the Related Avoidance Actions, who contributed initial capital to SCC in exchange for Class A membership interests. The

Wills Trust contributed $2,000,000 (of the total $12,500,00 in initial capital contributed from outside investors), representing 16% of the Class A initial capital contributions but only ***4% of the total equity in SCC*** at initial capitalization. Pl. Ex. D, Rickard Dep., Ex. 4, Appx. 408. Class A investors provided $12,500,000 in initial capital and received 25% of the total equity in SCC, with Silver Star contributing $1,000,000 in initial capital in exchange for 75% of the total equity in SCC. *Id.* In terms of dollars contributed to the initial capitalization of SCC, at $2,000,000, the Wills Trust was the largest investor in SCC. *Id.*; Pl. Ex. E, Rickard 30(b)(6) Dep., 62:19-63:10, Appx. 430. After this initial investment in 2009, the Wills Trust never purchased any other membership units of any class in SCC. Eric Wills, however, did invest $5,000,000 as part of a 2016 equity offering of Class A membership interests in SCC through ERJMJ, which resulted in ERJMJ owning ***2.267% of the total equity interests in SCC*** and diluted ***the Wills Trust's original ownership percentage in SCC of 4% to 3.6427%*** as of December 31, 2017. Pl. Ex. D, Rickard Dep., Ex. 4, Appx. 408-409. Eric Wills, directly or indirectly, also held warrants in SCC's Class C units resulting from a 2009 loan, Pl. Ex. F, Wills Dep., 91:10-25, Appx. 357, which warrants were extended by SCC in August 2018 (six months after the Pharmacy Sale and the Bridge Loan Transfer), possibly for no consideration. Pl. Ex. F., Wills Dep., 250:22-254:24, Appx. 466-467 and Ex. 74, Appx. 1000.[21]

The Wills Trust does not and did not own any interest in Granite. Def. Ex. A, Wills Decl., ¶5, Appx. 4. Eric Wills has never been an officer, manager, director, or employee of SCC or of Granite. *Id.* at ¶1, Appx. 3. Eric Wills has never had any responsibility for making any day-to-day

---

[21] Eric Wills testified that he "may have" requested an extension of the warrant period in the summer of 2018 and that he didn't remember if he "pa[id] anything for an extension" but if he had any documents that related to the "payment or consideration given to that extension," he would have produced it." Pl. Ex. F, Wills Dep., 254:16-255:11 (Appx. 467).

decisions for either SCC or Granite. *Id.*  The Wills Trust has never served as an officer, manager, director, or employee of either SCC or Granite. *Id.*

Eric Wills was a significant investor in many Granite entities, some of which were Granite Landlords that leased nursing home properties to SCC. Pl. Ex. F, Wills Dep., 47:18-51:10, Appx. 451.  Eric Wills also served on the SCC Oversight Committee for both SCC and for Granite Landlords that leased real estate to SCC. *Id.*, 271:6-17, Appx. 468; Pl. Ex. H, Excerpts of Deposition of Nicole R. Hallsey ("Hallsey Dep."), Ex. 13, Appx. 1092-1093.

### 2. *SCC's CIBC Credit Agreement*

SCC's main source of financing during all relevant times was with CIBC Bank USA. Specifically, in June of 2017, SCC, as borrower (with certain of the other Debtors, as borrowers) entered into a Credit and Security Agreement with The PrivateBank and Trust Company (shortly thereafter conducting business as CIBC Bank USA), as lender, lead arranger, and administrative agent, dated June 21, 2017 ("CIBC Credit Agreement"), that provided SCC with a revolving credit loan in the aggregate principal amount of $12,500,000. Pl. Ex. A, Elrod Decl., Exhibit 2 CIBC Credit Agreement, Appx. 27-210; Disclosure Statement, at 3. Section 5.1 of the CIBC Credit Agreement provides as follows:

> **Section 5.1    Debt; Contingent Obligations**. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Debt. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations, except for Permitted Contingent Obligations.

Pl. Ex. A, Elrod Declaration, Exhibit 2 CIBC Credit Agreement, at § 5.1, Appx. 105. Significantly, the Trustee did not point to any record evidence – even to other provisions of the CIBC Credit Agreement – to support his conclusory statement in footnote 4 of his Complaint that "[t]he Note [i.e., the note involved in this litigation] was not a Permitted Debt or Permitted Contingent

Obligation, as such terms are defined under the CIBC credit agreement." Complaint, at 6 n.4. While the statement seems plausible, the summary judgment stage requires some evidence to support this statement (more to follow on this point).

3. _The Bridge Loans to Granite from the Bridge Lenders, Including the Wills Trust, in October and/or December 2017_

In 2017, SCC began negotiations for the sale of its pharmacy subsidiary, Harden Pharmacy, LLC ("Pharmacy Sale") to address liquidity concerns arising from its aging accounts receivable. Pl. Ex. E, Rickard 30(b)(6) Dep., 75:13-76:15, Appx. 433. The Disclosure Statement provided that "[t]he Debtors determined that the Pharmacy Sale was necessary because a working capital infusion of cash was needed as the Debtors began to default under certain covenants under various loan documents." Disclosure Statement, at 3. After the decision was made to pursue and negotiate the Pharmacy Sale, SCC determined that it needed short-term working capital until the Pharmacy Sale could be completed, so SCC solicited the Wills Trust and the other Bridge Lenders to make the Bridge Loans (to enable SCC to bridge the gap until the Pharmacy Sale closed). Pl. Ex. E, Rickard 30(b)(6) Dep., 56:19-58:5, Appx. 428-429; Def. Ex. A, Wills Decl., at ¶3, Appx. 3; Def. Ex. D, Rickard 30(b)(6) Dep., 53:16-19, Appx. 73. To enhance the credit, SCC obtained Granite's agreement to support the loan, whereby the Bridge Loans would actually be made to Granite, and then a corresponding loan would be made from Granite to SCC, with "the intent . . . that these were direct loans to Senior Care through the conduit of Granite." Def. Ex. D, Rickard 30(b)(6) Dep., 35:10-36:16, Appx. 69-70. The Debtors and the UCC, as proponents of the Plan, described the bridge loan transactions as "a series of . . . short-term high-interest bridge financing loans" that "the Company" entered into "with certain outside investors (the 'Outside Investors Notes') introduced through Granite." Disclosure Statement, at 3 n.3. Kerr—SCC's CFO and later the

President of SCC—testified that he was not aware of anything "that identified [the Bridge Loan Transactions] in October and December 2017 . . . as anything other than an arm's-length business transaction," Def. Ex. B, Kerr Dep., 240:15-20, Appx. 27, that was "motivated by [the Bridge Lenders', SCC's, and Granite's] own business concerns." *See id.*, 239:23-240:5, Appx. 26-27. All ten of the Bridge Lenders in the Related Avoidance Actions other than this Action, participated in the Bridge Loan transaction that occurred in October 2017 that totaled $12 million in the aggregate ultimately advanced to SCC. Pl. Ex. C, Heller Dep., Ex. 17 (Appx. 342-381, 387).  Neither Eric Wills nor the Wills Trust made a Bridge Loan in October 2017; rather, the Wills Trust made its first Bridge Loan in December 2017 in the amount of **$5,000,000**. *Id.* (Appx. 338-341, 384). Of all the Bridge Loans made by the Bridge Lenders in October and December of 2017, the Wills Trust's Bridge Loan was the largest amount. *Id.* (Appx. 338-381).  Eric Wills, in his sworn declaration in support of the MPSJ, stated that all transactions between the Wills Trust and SCC "were based purely on the economic opportunities being presented by the transaction" and that he agreed to make the specific Bridge Loan to Granite at issue "because of the economic terms being presented" and further that "[his] evaluation of the loan requested by Mr. Rickard was based purely on the economic and commercial viability of the loan" and "[a]t the time of the loan, it was [his] opinion that the loan terms were on par with the market rates for the loans of this nature." Def. Ex. A, Wills Decl., ¶ 3, Appx. 3.

In December 2017, Granite borrowed **$5,000,000** from the Wills Trust pursuant to that certain Secured Promissory Note ("Granite/Wills Note") dated December 8, 2017, and identified as "Note # 9029." Pl. Ex. C, Heller Dep., Ex. 17, Appx. 338-341. While the October 2017 Bridge Loans by the Bridge Lenders other than the Wills Trust were all secured by certain of Granite's equity interests in Silver Star, *see id.*, Appx. 342-381, the Granite/Wills Note was secured by different collateral:

> [Granite] holds 100% of the Membership Interests in Granite Senior Housing, LLC
> ("**GSH**") and Granite Master Partners, LLC, GP ("**GMP GP**"). GSH holds a
> 80.75% interest in Granite Master Partners, LLC ("**GMP**"); GSH holds a 1%
> membership interest in GMP; John J. Heller ("**Heller**") holds a 12% membership
> interest in GMP, and M. Scott Rickard ("**Rickard**") holds a 6.25% interest in GMP.
> GMP in turn holds a 50% membership interest in Granite Texas Senior Holdings
> IV, LLC, a Delaware limited liability company ("**GTSH IV**"). The collateral
> securing repayment of all sums due and owing under the Note consists of the 50%
> membership interest held by GMP in GTSH IV, LLC ("**Granite Collateral**").

*Id.*, Appx. 341. Each of the Bridge Loan Notes, including the Granite/Wills Note, provided, at

Exhibit A that "[t]he purpose of the loan evidenced by the Note is to allow Borrower to advance

working capital to one of its affiliated entities, Senior Care Centers, LLC, a Delaware limited

liability company ('*SCC*')." *Id.*, Appx. 338-381. The Maturity Date for the Granite/Wills Note

was February 5, 2018. *Id.*, Appx. 338. Eric Wills stated in his sworn declaration that the loan to

Granite was intended to "ultimately inure to the benefit of Senior Care Centers, LLC." Def. Ex. A,

Wills Decl., at ¶3, Appx. 3. Apparently, the Bridge Loan proceeds from the Granite/Wills Note

were wired directly to SCC's bank account—presumably on or about December 8, 2017—the

same date as the Granite/Wills Note—and Granite "recognize[d] that the money that was being

wired directly to SCC, was money that was being advanced under the promissory notes that Granite

had made to the bridge lenders." Def. Ex. D, Rickard 30(b)(6), 121:18-122:11, Appx. 91-92.[22] To

be clear, SCC was the actual recipient and beneficiary of the Bridge Loan proceeds, including

those funds wired to SCC by the Wills Trust.

4.  *The Related Notes Made by SCC to Granite (Apparently Dated October 2017 and*
    *December 2017)*

Mr. Kerr testified in his deposition that the funds SCC received in October 2017 from the

Bridge Lenders (other than the Wills Trust, which did not participate in the October 2017 Bridge

---

[22] While the actual date of the Wills wire to SCC is not in the summary judgment record, Mr. Rickard, of Granite,
testified that "[b]ased on when it was funded, the note would be issued"—presumably implying that notes were dated
based on when actual funding occurred.

Loan Transaction) were essentially funds SCC borrowed from Granite, pursuant to the terms set

forth in a Promissory Note in the amount of $12,000,000 marked "Note # GI-9009A" ("October

2017 SCC/Granite Note"), which reflected "th[e] deal terms agreed to by SCC prior to it receiving

the money from Granite"—which money Granite had borrowed from the Bridge Lenders. Def. Ex.

B, Kerr Dep., 219:6-222:3, Appx. 13-16.   While the bankruptcy court is using the defined term

"October 2017 SCC/Granite Note," this note is not dated, except in a footer which states "10-5-17

Promissory Note (October SCC Granite Loan)." Pl. Ex. C, Heller Dep., Ex. 17, Appx. 385-386.

Attached to the October 2017 SCC/Granite Note is a schedule of the Bridge Loans made by the

Bridge Lenders to Granite, in the aggregate amount of $12,000,000, entitled "Schedule A – SCC

Note Obligation to Granite Investment Group." *Id.*, Appx. 387.  The October 2017 SCC/Granite

Note provided that "[a]ll outstanding principal and accrued and unpaid interest, if any, shall be due

and payable on Maturity Date reflected on Schedule A ('***Maturity Date***')." *Id.*, Appx. 385.  The

Maturity Date for the SCC/Granite Note was defined as December 20, 2017 (for the most part).[23]

    The Trustee references an email dated April 17, 2018, from Mr. Kerr to Nicole Hallsey

(Granite's Director of Investor Services), in which Mr. Kerr transmitted an "executed copy" of the

October 2017 SCC/Granite Note, in response to Ms. Hallsey's request, after she noted that Granite

was "unable to locate an executed copy of the attached note from October 2017" and noting that

"[t]he accountants and auditors are asking for an executed copy." Pl. Ex. E, Rickard 30(b)(6) Dep.,

Appx. 437-438.[24]  Ms. Hallsey had forwarded an email from Scott Rickard dated October 26, 2017,

---

[23] The attached Schedule A referenced all of the October 2017 Bridge Loans and indicated that the Maturity Date for amounts due under the October 2017 SCC/Granite Note coincided with the Maturity Dates on the various Bridge Loans.  The Maturity Date for all of the October 2017 Bridge Loans except for two was December 20, 2017.

[24] There is a dispute as to whether: (a) Mr. Kerr executed the October 2017 SCC/Granite Note actually in October of 2017 (and Granite was simply unable to find an executed copy for its records and for the auditors and Mr. Kerr was transmitting the copy that he had in his records that had been actually, contemporaneously executed by him in October 2017); or (b) Mr. Kerr was "re-executing" the October 2017 SCC/Granite Note in April of 2018; or (c) Mr. Kerr was executing the October 2017 SCC/Granite Note for the first time in April of 2018, which would have been after the

in which Mr. Rickard (Chief Investment Advisor of Granite and a former Director of SCC) had originally requested that Mr. Kerr execute the (apparently attached) October 2017 SCC/Granite Note. *Id.*, Appx. 438.   In response to Mr. Kerr's April 17, 2018 email transmitting an executed copy of the October 2017 SCC/Granite Note, Ms. Hallsey emailed Mr. Kerr back, on April 27, 2018, stating, "Andrew, Per BKD's request I created a new note with the amended maturity dates. Please sign the attached and email back to me at your first opportunity," to which was attached an unexecuted copy of a Promissory Note ***in the amount of $15,100,000*** marked "Note # GI-9009B," with SCC as borrower and in favor of Granite as noteholder ("<u>December 2017 SCC/Granite Note</u>," and with the October 2017 SCC/Granite Note, the "<u>SCC/Granite Note</u>"), and then again on May 4, 2018, stating, "Andrew, Following up on this. Can you please sign and send back." *Id.*, Appx. 437.   While the court is using the defined term "December 2017 SCC/Granite Note," this note is not dated, except in a footer that states "SCC/GIG Promissory Note--December 2017." Pl. Ex. C, Heller Dep., Appx. 382-383.   The summary judgment evidence does not indicate why the amount of the note was increased to $15,100,000, although it appears to the bankruptcy court, from scrutinizing the attached Schedule A, that the new Wills Trust Bridge Loan of $5,000,000 had been added by December 2017 and two of the October 2017 Bridge Loans totaling $1,900,000 had been paid off.   As with the October 2017 SCC/Granite Note, the December 2017 SCC/Granite Note tied the maturity date of the note to the maturity dates of the Bridge Loans that were listed on a "Schedule A – SCC Note Obligation to Granite Investment Group" in the aggregate amount of $15,100,000. *Id.*, Appx. 382-384.   Schedule A attached to the December 2017 SCC/Granite Note showed a Maturity Date of February 5, 2018, for each and every one of the Bridge Loans

---

Bridge Loan Transfer occurred in February 2018. As discussed below, however, the timing of the execution of the October 2017 SCC/Granite Note (and, more broadly, whether ***Granite's*** advance to SCC might be deemed a loan or an equity contribution) is ultimately immaterial to the issue of whether the funds received by SCC in October 2017 ***from the Bridge Lenders*** through Granite constituted reasonably equivalent value in exchange for the Bridge Loan Transfers.

shown on Schedule A, and included on the list the new $5,000,000 "Note Number 9029" in favor of the Wills Trust. *Id.*, Appx. 384.

Mr. Kerr also testified in his deposition about an email on which he was copied and received, dated October 12, 2017, from Scott Rickard to Kurt Clamp (a treasury department manager at SCC) regarding the final breakdown of the outstanding Bridge Loans and stating, "We will now need to work on documenting the loans between Granite and SCC." Def. Ex. B, Kerr Dep., 232:7-234:23, Appx. 21-23; Def. Ex. E, Ex. 42 to Kerr Dep., Appx. 95.  Mr. Kerr testified that, at the time the email was sent, it was "clear to [him] that there was an expectation that SCC would have to repay Granite this money and would have to repay it with interest, and on the time schedule necessary so that Granite could fulfill its obligations to its bridge lenders." Def. Ex. B, Kerr Dep., 233:8-234:16, Appx. 22-23.  Mr. Kerr further testified that the way the accounting of the Bridge Loan Transactions worked within SCC's accounting system was that, when the Bridge Loan proceeds were received by SCC directly from the Bridge Lenders, the amounts would be debited as cash and credited as a liability as a "note payable to Granite." *Id.*, 226:6-227:4, Appx. 19-20.

Mr. Rickard, as the Rule 30(b)(6) representative for Granite, and who was also a director of SCC at the time of the Bridge Loan Transfer, testified that the intention of the parties had always been that the Bridge Loans "were direct loans to Senior Care through the conduit of Granite," and that there was, along with the loans from the Bridge Lenders to Granite, a "corresponding loan from Granite to Senior Care, with an exhibit reflecting each of the individual investors that put money into that loan with Granite." Def. Ex. D, Rickard 30(b)(6) Dep., 35:10-36:11, Appx. 69-70; *see also id.*, 115:20-116:11, Appx. 86-87.  Mr. Rickard confirmed that the October 2017 SCC/Granite Note and the December 2017 SCC/Granite Note were "consistent with [his]

understanding of what the arrangement was between Granite and SCC" and that they "accurately document[ed] the agreement between SCC and Granite, with respect to the funds that were flowing into SCC by virtue of the bridge lenders." *Id.*, 118:10-21, Appx. 88.

On February 5, 2018—apparently just following the Pharmacy Sale and on the stated Maturity Date of the December 2017 SCC/Granite Note and the Granite/Wills Note—SCC transferred $5,221,232.88 directly to "Wills Revocable Living Trust." Pl. Ex. F, Excerpts of Deposition Transcript of Eric Wills dated September 9, 2021 ("<u>Wills Dep.</u>"), Ex. 65, Appx. 982. The Disclosure Statement stated that SCC used the proceeds of the Pharmacy Sale, in part, to pay off the Bridge Loans made by "Outside Investors" in the aggregate amount of $12,676,513. Disclosure Statement, at 3. The Trustee, in his Opposition, avers that the proceeds of the Pharmacy Sale were used "to pay Wills, the other Bridge Lenders, and . . . a Granite affiliate which owned and leased SNFs to certain of the Debtors." Opposition, at 7. In any event, it is undisputed that the Bridge Loan Transfer resulted in the satisfaction of Granite's obligation to the Wills Trust under the Granite/Wills Note.[25] When Mr. Kerr was asked how the payments by SCC to the Bridge Lenders would have been "booked" at SCC, he confirmed that SCC would have credited cash and debited the Granite note payable, a liability of SCC owed to Granite:

> Q:    All right. When SCC made these payments in both December 2017 and then February 2018, how would they have booked those payments?

> A:    They would have credited cash and debited the liability "note payable."

> Q:    Note payable to whom?

> A:    Granite.

---

[25] *See* Complaint, ¶33 ("[SCC] . . . ma[de] payment to [Wills] in satisfaction of Granite's obligations under the [Granite/Wills Note].").

> Q:      So SCC when they made each of these payments that went to the bridge lenders, each of those payments were recorded in SCC's books against the liability being owed to Granite?
>
> . . .
>
> Q:      Is that how that would work?
>
> A:      Yes.

Def. Ex. B, Kerr Dep., 227:5-19, Appx. 20.   When asked whether, "when that $12,676,000 was paid out by SCC [to the Bridge Lenders], . . . SCC g[o]t the benefit of a credit against the debt it owed to Granite," Mr. Kerr answered in the affirmative. Def. Ex. B, Kerr Dep., 225-25-226:4, Appx. 18-19. Mr. Rickard agreed that the Pharmacy Sale proceeds were used, in part, to satisfy both SCC's obligations under the SCC/Granite Note and the obligations of Granite to the Bridge Lenders under the Bridge Loans:

> Q:      Do you recall that the proceeds of [the Pharmacy Sale] were used for various purposes?
>
> A:      Yes.
>
> Q:      And would you agree with me, that they were used to satisfy Granite's obligations under the notes for the bridge lenders?
>
> . . .
>
> A:      They satisfied Senior Care's obligation of their notes.
>
> Q:      Okay. Did they satisfy Granite's obligation under its notes with the bridge lenders?
>
> A:      By satisfying Senior Care's, they did satisfy Granite. So in other words, our guarantee or our pledge of interest, was released as a result of Senior Care paying the investors forever.
>
> Q:      And the debt was satisfied between Granite and the bridge lenders, correct?
>
> A:      As was the debt with Senior Care Centers, that's correct.

Def. Ex. D, Rickard 30(b)(6), 74:11-75:5; Appx. 76-77; Pl. Ex. E, Rickard 30(b)(6), 74:11-75:5, Appx. 361.

The Debtors' and UCC's Plan was confirmed on December 13, 2019, pursuant to which the Trustee's causes of action against the Wills Trust for avoidance of the Bridge Loan Transfer were transferred to the UCT.  Specifically, "Wills Family Trust" was identified as a Bridge Loan Transferee along with the amount of the Bridge Loan Transfer in Exhibit K "Schedule of Unsecured Creditor Trust Causes of Action" under a listing of "Payments Made 1 Year Prior to Filing: Granite" under the "Payment Categor[y]" of "Bridge Loan Payment."[26]

## B.  *Summary Judgment Standard*

Rule 56(a) of the Federal Rules of Civil Procedure permits a party to move for summary judgment on a claim or defense or a "part of" a claim or defense, and further provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56 "*mandates* the entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added in original)), because  "[i]n such a situation, there can be  'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S.Ct. at 2552. "When the movant bears the burden of proving an affirmative defense at trial, 'it must establish beyond dispute all of the defense's essential elements.'" *Soto v. William's Truck Service, Inc.*, Civ. A. No. 3:11-cv-3242-B, 2013 WL 487070, *1 (N.D. Tex. Feb. 8, 2013)(quoting *Bank of La. v.*

---

[26] Bankr. Dkt. No. 2219, Exhibit K Schedule of Unsecured Creditor Trust Causes of Action, 176-177, 182.

*Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006)(citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).  A fact is ***material*** "if the governing substantive law identifies it as having the potential to affect the outcome of the suit." *Hutton Communications, Inc. v. Communication Infrastructure Corp.*, 461 F.Supp.3d 400, 403 (N.D. Tex. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  A dispute as to a material fact is ***genuine*** "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505) (other citation omitted)).

"[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotations omitted); *see also Kennedy v. Allstate Texas Lloyd's*, 2020 WL 8300511, at *1 (N.D. Tex. Dec. 14, 2020) ("Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial.") (citing *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).  Rather, pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Under Rule 56, a movant "need not 'negate' the elements of the nonmovant's case," *Little*, 37 F.3d at 1075, but rather meets [his] initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir.1990) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554).[27]  "If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.").  "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted)); *see also Little*, 37 F.3d at 1075 ("[T]he nonmovant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.").  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citing *Matsushita*, 475 U.S. at 586-587 (footnote omitted)).

---

[27] Thus, the burden under Rule 56 is not on the moving party "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.  "Instead, . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

When evaluating a motion for summary judgment, the court views the facts "in the light most favorable to the nonmoving party" but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. at 380, 127 S.Ct. at 1776; *see also Hacienda Records, L.P. v. Ramos*, 718 F.App'x 223, 234 (5th Cir. 2018) ("The court considers the record as a whole, and draws all justifiable inferences in favor of the non-movant[, b]ut the non-movant bears 'the burden of demonstrating by competent summary judgment proof that there is [a genuine dispute] of material fact warranting trial.'")(internal citations omitted). "[I]t is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact." *Hutton Communications*, 461 F.Supp.3d at 403 (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5ᵗʰ Cir. 2003)). Rather, "[t]he nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine issues as to the material facts." *Id.* (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant." *Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury."); *see also*, *Anderson* 477 U.S. at 251-252, 106 S.Ct. at 2512 (where the Court stated that the inquiry under a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). If the nonmoving party fails to meet his burden of submitting competent summary judgment evidence that there is a genuine dispute as to a material fact, "the motion for summary judgment ***must*** be granted." *Little*, 37 F.3d at 1076

29

(emphasis added) ("A plaintiff should not be required to wait indefinitely for a trial when the defendant has a meritless defense that can be resolved on motion for summary judgment.").

**C. Legal Conclusions: With regard to the Bridge Loan Transfer and the Wills Trust's Motion for Partial Summary Judgment, it should be Granted with respect to the Fraudulent Transfer Theories (in Counts I through IV), but Denied with respect to the Insider Preference Theory (in Counts V and VI)**

1. *Constructive Fraudulent Transfer Causes of Action Regarding Bridge Loan Transfer (Counts I and IV)*

The Trustee seeks to avoid the Bridge Loan Transfer as constructively fraudulent under TUFTA § 24.005(a)(2), via Bankruptcy Code § 544(b) (Count I of the Complaint), and also under Bankruptcy Code § 548(a)(1)(B) (Count IV of the Complaint) and—in either case—to recover the value of the Bridge Loan Transfer pursuant to Bankruptcy Code § 550.

To avoid the Bridge Loan Transfer as constructively fraudulent pursuant to either TUFTA § 24.005(a)(2) or Bankruptcy Code § 548(a)(2), the Trustee must show, in the first instance, that SCC did not receive "reasonably equivalent value" in exchange for the Bridge Loan Transfer. The Wills Trust argues that it is entitled to summary judgment as to both Counts I and IV due to the Trustee's failure to point to record evidence that supports this essential element of his constructive fraud claims. To the contrary, the Trustee argues the lack of "reasonably equivalent value" received from the Wills Trust works as follows: the constructive advances of funds from ***Granite to SCC*** were not loans, but were mere equity contributions from Granite to SCC, and, therefore, the Bridge Loan Transfer to the Wills Trust was not made in satisfaction of an antecedent debt of SCC. At best, the Bridge Loan Transfer was made in satisfaction of an antecedent debt of ***Granite*** to the Wills Trust, for which SCC was not liable. While this was a

three-party agreement set up as multiple loans, the primary thrust of the Trustee's argument is that

the Bridge Loan Transfer must be deemed to have been a return of a Granite equity contribution

to the Debtors, which would not constitute an exchange for reasonably equivalent value.

The bankruptcy court concludes that the Wills Trust is entitled to summary judgment as to

the Trustee's causes of action in Counts I and IV relating to the Bridge Loan Transfer for two

reasons:  (1) the Trustee's argument on this issue ignores established law as to what constitutes

reasonably equivalent value to a debtor in three-party transactions such as the one at issue, and (2)

the Trustee has not pointed to the existence of a genuine dispute of material fact that would

preclude the entry of summary judgment in favor of the Wills Trust as to these causes of action.

As noted above, to successfully avoid a transfer as constructively fraudulent pursuant to

TUFTA § 24.005(a)(2) or Bankruptcy Code § 548(a)(2), a plaintiff must show that the debtor

transferor did not receive "reasonably equivalent value" in exchange for the Bridge Loan Transfer.

Section 24.005(a)(2) states that a transfer is fraudulent if the debtor made the Bridge Loan Transfer

> (2) ***without receiving a reasonably equivalent value in exchange for the transfer***
> or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for
>> which the remaining assets of the debtor were unreasonably small in relation to the
>> business or transaction; or
>>
>> (B) intended to incur, or believed or reasonably should have believed that
>> the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Comm. Code § 24.005(a)(2) (emphasis added).   Similarly, under Bankruptcy

Code § 548(a)(2), a plaintiff must present evidence that the debtor transferor "received less than

reasonably equivalent value in exchange for such transfer . . . ."   Bankruptcy Code § 548(a)(2).

Under both TUFTA and the Bankruptcy Code, "value" includes, but is not limited to, the

satisfaction of an antecedent debt of the debtor. *See* Tex. Bus. & Comm. Code § 24.004(a) ("Value

is given for a transfer . . . if, in exchange . . . an antecedent debt is secured or satisfied . . . ."); Bankruptcy Code § 548(d)(2)(A) ("'[V]alue' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."). Courts have recognized that, in analyzing value in this context, one must look at a transaction or series of transactions as an integrated whole and analyze the net economic benefit to the debtor from the viewpoint of value received by the debtor at the time of the transfer. *See Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993) ("[T]he recognized test is whether the investment conferred an economic benefit on the debtor.") (citing *In re Rodriguez*, 895 F.2d 725, 727 (11th Cir. 1990) and *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981)), and that "reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule." *Harman v. First Am. Bank (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 485 (4th Cir. 1992);[28] *see also In re Fairchild*, 6 F.3d 1119 (where the Fifth Circuit held that Fairchild received reasonably equivalent value in exchange for payment of jet fuel costs of an affiliated airline, even though benefit to the debtor was indirect: the potential proceeds of a possible sale of the affiliated airline by keeping the affiliated airline in business); *Yaquinto v. CBS Radio, Inc. (In re Texas E&P Operating, Inc.)*, 2022 WL 2719472, *14 (Bankr. N.D. Tex., July 13, 2022) (where this court recently noted that "the Fifth Circuit has

---

[28] The *Jeffrey Bigelow* court quoted the court's reasoning in *Rubin*, "the leading case" on the indirect benefit rule:

> [A] debtor may sometimes receive 'fair' consideration even though the consideration given for his property or obligation goes initially to a third person . . . . [A]lthough 'transfers solely for the benefit of third parties do not furnish fair consideration' . . ., the transaction's benefit to the debtor 'need not be direct; it may come indirectly through benefit to a third person.' If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [the statute] has been satisfied – provided of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

*Jeffrey Bigelow*, 956 F.2d at 485 (quoting *Rubin*, 661 F.2d at 991-92 (citations omitted)).

recognized, in analyzing Section 548, that indirect benefits . . . conferred from transfers at issue can be recognized to serve as 'value' to debtor" and "[t]hus, the benefit of an obligation paid for by a debtor need not confer a direct benefit on the debtor.") (citing *In re Fairchild*, 6 F.3d at 1127); *PSN USA, Inc. v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 F. App'x 925 (11th Cir. 2015)(where the Eleventh Circuit, citing the indirect benefit rule line of cases including *Fairchild*, found a transfer to have been made in exchange for reasonably equivalent value where the transferee received payments from the debtor on a contract for satellite services signed by the debtor's corporate parent and to which the debtor was not a party and the satellite services had been provided directly to the debtor).   The Texas Supreme Court has also adopted the indirect benefit rule with respect to the "reasonably equivalent value" requirement under TUFTA's constructive fraud provision:

> While the definitions of "value" and "reasonably equivalent value" are expansive and nonexclusive, there is nevertheless an implicit requirement that the transfer confer some ***direct or indirect economic benefit*** to the debtor, as opposed to benefits conferred solely on a third-party, transfers that are purely gratuitous, and transactions that merely hold subjective value to the debtor or transferee.

*Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 574 (Tex. 2016) (emphasis added) (citations omitted).

In this Action, it is undisputed that the Bridge Loan Transfer satisfied the debt of Granite to the Wills Trust in effecting a repayment of the Granite/Wills Note and, therefore, provided a direct benefit to a third party—Granite. The question remains whether the Bridge Loan Transfer also conferred a direct or indirect benefit or value to SCC that was reasonably equivalent to the amount of the Bridge Loan Transfer, or—more  precisely for purposes of this summary judgment motion—whether the Trustee can meet his summary judgment burden of showing the existence of some record evidence that creates a genuine dispute of fact as to whether SCC received reasonably equivalent value in exchange for the Bridge Loan Transfer.

Although "[a] payment made ***solely*** for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor," *Osherow v. Nelson Hensley & Consol. Fund Mgmt. (In re Pace)*, 456 B.R. 253, 271 (Bankr. W.D. Tex. 2011) (quoting *In re Whaley*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999) and citing *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007)) (other citations omitted) (emphasis added), "reasonably equivalent value may be found in transfers involving third parties if the debtor received some indirect benefit from the transfer." *Id.* (citing *Smith*, 365 B.R. at 666-67). Moreover, a debtor receives reasonably equivalent value in exchange for a transfer in payment of a third party's debt if the transfer "results in a discharge of the debtor's own debt to the third party." *Id.* at 272 (quoting *Smith*, 365 B.R. at 667, listing the "three common scenarios where a debtor might be found to have received 'reasonably equivalent value' by discharging the debts of a third party."). Examples of a debtor receiving "fair" value in exchange for the repayment of a loan made to a third party (a corporation) include "where the corporation had served merely as a conduit for transferring the loan proceeds to him" and "where the debtor's discharge of a third person's debt also discharges his own debt to that third person." *Rubin*, 661 F.2d at 992 (citations omitted). The Second Circuit in *Rubin* opined that "[i]n each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred." *Id.*

The Fourth Circuit, in *Jeffrey Bigelow*, citing to *Rubin* as the leading case on the indirect benefit rule,[29] found that a debtor's payments directly to a bank that were made in repayment of advances under a line of credit provided to the debtor's shareholders were made in exchange for

---

[29] *See supra* note 28 and accompanying text.

reasonably equivalent value and, therefore, they were not constructive fraudulent conveyances so as to be avoidable by the chapter 7 trustee.  The bridge loan transfers that the chapter 7 trustee sought to avoid in *Jeffrey Bigelow* were made in substantially similar circumstances to the Bridge Loan Transfer at issue in this Action—(1) a shareholder of the corporate debtor had entered into a line of credit agreement with the bank for the benefit of the debtor; (2) although the shareholder was the maker on the line of credit, "only the debtor received draws" under the line of credit; (3) all payments on the line of credit were made directly from the debtor to the bank; (4) and five months later (after advances under the line of credit had been made directly to the debtor and payments on the line of credit had been made by the debtor directly to the bank), the debtor executed a note in favor of the shareholder "with substantially the same terms as the line of credit between [the bank] and [the shareholder]"—such that "a tripartite relationship exist[ed], where [the shareholder was] a creditor of the debtor and [the bank was] a creditor of [the shareholder]" and "[t]he debtor, in making its payments, in effect skips its true creditor and sends the money to [the bank], to whom it has no direct obligation." *Jeffrey Bigelow*, 956 F.2d at 480-81.  In noting that "the focus is whether the net effect of the transaction has depleted the bankruptcy estate," the court held that "no fraudulent transfer occurred" when the debtor made direct payments to the bank:

> It seems apparent that the transfers have not resulted in the depletion of the bankruptcy estate. The transfers by the debtor served simply as repayment for money received. Other creditors should not be able to complain when the bankruptcy estate has received all of the money which it is obligated to repay. Otherwise, the creditors would receive not only the benefit of the money received from the draws on the lines of credit, but also the windfall of avoided transfers designed to repay the draws. In essence, the estate, and hence the unsecured creditors, would be paid twice. Consequently, we hold that no fraudulent transfer occurred.

*Id.* at 485.

The burden of proving a lack of reasonably equivalent value falls on the Trustee – the party seeking to avoid the transfer as a constructively fraudulent conveyance. *Yaquinto v. CBS Radio, Inc. (In re Texas E&P Operating, Inc.)*, 2022 WL 2719472, *13 (Bankr. N.D. Tex., July 13, 2022) (citing *In re McConnell*, 934 F.2d 662, 665 n.1 (5th Cir. 1991) and *Altus Brands II, LLC v. Alexander*, 435 S.W.3d 432, 441 (Tex. App.—Dallas 2014, no pet.)).  Here, that means the burden is on the Trustee to show that SCC ***did not*** receive a direct or indirect benefit in exchange for the Bridge Loan Transfer—that SCC ***did not*** receive a discharge or satisfaction of its own debt to Granite in making the Bridge Loan Transfer or otherwise receive a direct or indirect benefit in exchange for the Bridge Loan Transfer, when it was the direct recipient of the Bridge Loan proceeds under the three-party transaction.  It is the Trustee's failure to point to record evidence to support his allegation of "lack of reasonably equivalent value" that the Wills Trust argues entitles it to summary judgment with respect to Counts I and IV of the Complaint.  The bankruptcy court agrees with the Wills Trust and recommends that the District Court grant partial summary judgment in favor of the Wills Trust on the Trustee's causes of action in Counts I and IV relating to the Bridge Loan Transfer.[30]

The Wills Trust has met its initial burden as movant as to this issue by pointing out an absence of evidence to support an essential element of the Trustee's constructive fraud causes of action—that SCC did not receive reasonably equivalent value in exchange for the Bridge Loan Transfer. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554 (moving party meets his initial burden by pointing out the absence of evidence to support the nonmoving party's case); *see also Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990) (same).  The Wills Trust has

---

[30] To be clear, the court recommends granting partial summary judgment with respect to Counts I and IV only as to the Bridge Loan Transfer because the Defendants have not moved for summary judgment as to the Trustee's causes of action in Counts I and IV relating to the Dividend Transfers.

pointed to overwhelming record evidence that the Bridge Loan was part of a three-party transaction whereby (1) Granite borrowed $5,000,000 from the Wills Trust pursuant to the Granite/Wills Note, which expressly identified that the purpose of the loan was to allow Granite "to advance working capital" to SCC;  (2) Granite constructively advanced the proceeds of the Granite/Wills Note (and of the other Bridge Loans) to SCC pursuant to, and in accordance with, the terms of the SCC/Granite Note; (3) the Wills Trust wired the $5,000,000 directly to *SCC* in December 2017, contemporaneously with the execution of the Granite/Wills Note; (4) SCC used the proceeds to pay *SCC's* operating expenses pending the Pharmacy Sale, which ultimately closed in February 2018; (5) SCC used some of the proceeds of the Pharmacy Sale to make the Bridge Loan Transfers directly to the all of the Bridge Lenders, including to the Wills Trust on February 5, 2018; (6) which satisfied Granite's obligations to the Wills Trust under the Granite/Wills Note *and* SCC's obligations to Granite under the SCC/Granite Note (an antecedent debt of SCC).

The burden shifts, then, to the Trustee to show that there isn't an absence of evidence to support his constructive fraud claims—in other words, to "identify specific evidence in the record *and* articulate the manner in which that evidence supports [his] claim." *Duffie*, 600 F.3d at 371 (quoting *Johnson*, 379 F.3d at 301) (citation omitted) (emphasis added).  Here, the Trustee has failed to meet his burden.  First, the Trustee's conclusory allegations and unsubstantiated assertions in his Complaint are not sufficient to defeat summary judgment. *See Turner*, 476 F.3d at 343; *Kennedy*, 2020 WL 8300511, at *1; *Recile*, 10 F.3d at 1097.  This is especially true here, where the Trustee alleges in the "Factual Background" of his Complaint, albeit alternatively, that "SCC *was* liable on the Note or on other debt owing to the Defendants," Complaint, ¶ 37 (emphasis added), and, separately (although the Trustee does not explicitly state that he is pleading the causes of action in the Complaint in the alternative), the Trustee alleges as a fact in support of his preferential transfer cause of action under TUFTA in Count V, "The [Bridge Loan] Transfer was

made for an antecedent debt or debts owed by SCC to Wills," Complaint, ¶ 68, and in support of

his preferential transfer cause of action under Bankruptcy Code § 547 in Count VI, "The [Bridge

Loan] Transfer was made for or on account of an antecedent debt or debts owed by SCC to Wills

before the [Bridge Loan] Transfer was made." Complaint, ¶ 76.

This is also especially true in this case, where the Trustee seems to misunderstand and

mischaracterize in his Complaint what constitutes "value" under TUFTA and the Bankruptcy Code

for purposes of analyzing whether the Bridge Loan Transfer was made in exchange for a lack of

"reasonably equivalent value."  The Trustee alleges in his Complaint only that the Bridge Loan

Transfer was either made for an antecedent debt "owed by SCC *to Wills*," Complaint, ¶¶ 68, 76

(emphasis added), or, alternatively, that SCC was "not legally obligated on the [Granite/Wills

Note]" but rather SCC "paid Granite's debt [owed to the Wills Trust] by making payment to the

Defendant in satisfaction of Granite's obligations [to the Wills Trust] under the [Granite/Wills

Note]" and, therefore, did not pay *its* antecedent debt *owed to the Wills Trust*. Complaint, ¶ 33

(emphasis added).  The Trustee leaps from his allegation in the Complaint that SCC was not liable

*to the Wills Trust* under the Granite/Wills Note to his conclusory allegations in the constructive

fraud counts that "SCC (and the Debtors generally) did not receive reasonably equivalent value in

exchange for the [Bridge Loan Transfer] because the consideration purportedly provided in

exchange was either non-existent or not reasonably equivalent," Complaint, ¶46, and that "SCC

received less than a reasonably equivalent value in exchange for the [Bridge Loan] Transfer . . . ."

Complaint, ¶ 61.  But, nowhere in the definition of "value" under TUFTA or Bankruptcy Code §

548(d)(2)(A) is there a requirement that the satisfaction of "an antecedent debt of the debtor" be a

satisfaction of an antecedent debt of the debtor *owed to the transferee* of the allegedly avoidable

transfer. Indeed, it is well-settled that reasonably equivalent value, including satisfaction of an

antecedent debt, can come from someone *other than the transferee*. *See Frontier Bank v. Brown*

*(In re Northern Merch., Inc.)*, 371 F.3d 1056, 1058 (9th Cir. 2004) (citing *Jeffrey Bigelow*, 956 F.2d at 485).

It is not until his Opposition that the Trustee fleshes out his theory of his constructive fraud counts, where he argues, in essence, that the original transfer in December 2017 by the Wills Trust of the $5,000,000 directly into SCC's account (undisputed fact), was advanced by the Wills Trust pursuant to the Granite/Wills Note (undisputed fact), that Granite only constructively received the proceeds (undisputed fact), and that Granite (which did not own, directly, any membership interests in SCC, but only an indirect interest through its majority ownership of Silver Star) then constructively transferred the proceeds to SCC (undisputed fact) as—and this is the Trustee's alleged disputed fact that he argues defeats the MPSJ—an equity injection, not a loan. Therefore, the Bridge Loan Transfer by SCC in February 2018 that was made directly to the Wills Trust (undisputed fact) was not made in satisfaction of an antecedent debt of SCC, but rather in repayment of an equity investment in SCC by Granite, such that SCC did not receive reasonably equivalent value in exchange for the Bridge Loan Transfer as a matter of law.

The Trustee's Opposition fails to defeat the MPSJ as to the constructive fraud causes of action relating to the Bridge Loan Transfer for two reasons: (1) the Trustee has failed to raise a dispute of a ***material*** fact; and (2) even if the Trustee had raised a dispute over a ***material*** fact, the Trustee has failed to show, by pointing to specific record evidence, that such dispute is ***genuine***. As noted above, a nonmovant must show a "genuine dispute" as to a ***material*** fact, and materiality hinges on whether "the governing substantive law identifies it as having the potential to affect the outcome of the suit." *Hutton Communications*, 461 F.Supp.3d at 403 (citing *Anderson v. Liberty Lobby*, 477 U.S. at 248). The Trustee does not dispute the three-party nature of the Bridge Loan transaction or that the proceeds of the Granite/Wills Note were transferred directly to SCC and that SCC was able to use the proceeds to pay its operating expenses pending the Pharmacy Sale;

rather, he argues that, when Granite constructively received the proceeds of the Bridge Loan from the Wills Trust, and, in turn, constructively advanced the proceeds to SCC, the advance constituted an equity investment in SCC by Granite and not a loan to SCC—thus suggesting that the nature of the **constructive** advance **by Granite to SCC** is a **material** fact under substantive constructive fraudulent conveyance law that would "hav[e] the potential to affect the outcome of the suit." *Id.*

This court disagrees with the Trustee and concludes that, in a three-party transaction such as the one at issue—where a debtor *directly receives the proceeds of a loan made to a third party*, even an insider of the debtor, and then makes direct payments to the lender in repayment of the loan to the third party—the *nature of the constructive advance of the proceeds by the third party to the debtor (i.e., as an equity investment in the debtor or as a loan to the debtor)—is irrelevant.* Thus, the nature of Granite's advance to SCC is not material under the law governing constructively fraudulent transfer claims (particularly, the well-settled "indirect benefit rule" that courts have applied in analyzing whether a debtor has received "reasonably equivalent value" in exchange for such transfers). Indeed, in *Frontier Bank*, a chapter 7 trustee sued a bank to avoid a corporate debtor's grant of a security interest to the bank to secure a documented loan made by the bank to the debtor's shareholders, who then "turned the funds over to the Debtor" in a three-party transaction similar to the one at issue in this Action, making the same argument as the Trustee here – that the debtor had not received reasonably equivalent value in exchange for the transfer (a grant of a security interest by the debtor to secure the loan made by the bank to the shareholders) because the constructive advance of funds from the shareholders to the debtor was a capital contribution, not a loan. *Frontier Bank*, 371 F.3d 1056. The Ninth Circuit rejected the trustee's argument. The Ninth Circuit described the three-party transaction and undisputed facts with respect thereto as follows:

> Debtor sought a . . . loan of $150,000 from Frontier to provide Debtor with working capital. Frontier refused to give such a loan to Debtor after determining that Debtor's financial performance did not support an additional direct loan to the company. However, Frontier agreed to loan $150,000 [to the three individual shareholders who were also officers and/or directors of Debtor], whose credit warranted such a loan. Frontier understood that the Shareholders would, in turn, allow Debtor to utilize the money to fund its business operations. In fact, the loan transaction was structured so that Frontier deposited the proceeds of the [loan] directly into Debtor's checking account. However, while the funds themselves were transferred directly from Frontier to Debtor, the transaction was documented as a loan to Shareholders, who then turned the funds over to Debtor. The [loan] was evidenced by a promissory note in favor of Frontier executed by Shareholders. However, on the same day that Shareholders entered into the [loan] with Frontier, Debtor executed a commercial security agreement granting Frontier a security interest in its inventory, chattel paper, accounts, equipment, and general intangibles.

*Frontier Bank*, 371 F.3d at 1057-58.   The chapter 7 trustee filed a complaint and moved for summary judgment against the Debtor, seeking to avoid the grant of the security interest as constructively fraudulent on the basis that the Debtor had not received reasonably equivalent value in exchange for the security interest.   The bankruptcy court granted the trustee's summary judgment, and, on appeal, the bankruptcy appellate panel affirmed the bankruptcy court's finding that a fraudulent conveyance had occurred.   The Ninth Circuit reversed, holding that the Debtor **did** receive reasonably equivalent value in exchange for the security interest and citing the indirect benefit rule established in *Rubin, Jeffrey Bigelow,* and other cases, as the basis for its holding. *Id.* at 1058-59.   Similar to the Trustee's argument here, the trustee argued to the Ninth Circuit that "because the transfer of $150,000 from Shareholders to Debtor was technically a capital contribution, rather than a loan, Debtor was under no legal obligation to grant a security interest to Frontier. Therefore, . . . Debtor would have been justified to not grant the security interest to Frontier, which would have resulted in an additional $150,000 in Debtor's estate." *Id.* at 1059.   In "reject[ing] this formalistic view," the Ninth Circuit stated,

> Although Debtor was not a party to the October loan, it clearly received a benefit from that loan. In fact, Frontier deposited the $150,000 proceeds of the October

41

Loan directly into Debtor's checking account. Because Debtor benefited from the October Loan in the amount of $150,000, its grant of a security interest to Frontier to secure Shareholder's indebtedness on that loan, which totaled $150,000, resulted in no net loss to Debtor's estate nor the funds available to the unsecured creditors. To hold otherwise would result in an unintended $150,000 windfall to Debtor's estate. Accordingly, Debtor received reasonably equivalent value in exchange for the security interest it granted to Frontier.

*Id.* This court agrees with the Ninth Circuit in *Frontier Bank* that, even if the constructive advance from the borrower to the debtor in a three-party transaction such as this is found to have been a capital contribution to the debtor (and not to have effected a loan or other obligation by the debtor to the borrower), any value transferred directly from the debtor to the lender would still be found to have been transferred in exchange for reasonably equivalent value because the debtor was the direct recipient of the loan proceeds. Thus, the Trustee's conclusory statement (unsupported by record evidence, as discussed below) that the constructive advance by Granite to SCC of the Bridge Loan proceeds was an equity contribution, not a loan, does not address an issue of ***material*** fact, which—if shown to be in genuine dispute—would defeat the MPSJ. Under established case law, because SCC received the $5,000,000 proceeds of the Bridge Loan made by the Wills Trust to Granite directly from the Wills Trust and was able to use the funds as working capital for the operation of its business pending the Pharmacy Sale, SCC received reasonably equivalent value in exchange for the Bridge Loan Transfer as a matter of law.

Even if the nature of the advance from Granite to SCC in this three-party transaction were relevant such that it could be considered a material fact, the Trustee has not shown that there is a genuine dispute as to that fact. The Trustee "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner*, 476 F.3d at 343 (internal quotations omitted). Rather, the Trustee, as nonmovant, must "identify specific evidence in the record ***and*** articulate the manner in which that evidence supports [his] claim." *Duffie*, 600 F.3d at 371 (quoting *Johnson*, 379 F.3d at 301 (citation omitted)) (emphasis added). Here, the

Trustee has failed to point to anything in the summary judgment evidence that could lead a rational trier of fact to find that SCC did not receive reasonably equivalent value in exchange for the Bridge Loan Transfer. The Trustee's entire argument in opposition to the MPSJ, with respect to the constructive fraud causes of action, is found in the "Arguments and Authorities" section of his Opposition at pages 11-16, in which he argues that there are "genuine issues of material fact" that would defeat the MPSJ with respect to the constructively fraudulent transfer claims asserted in Counts I and IV. Opposition, at 11. The Trustee cites a bankruptcy court opinion that "[t]here is no doubt that usually a diversion of corporate assets for the benefit of a third person, such as the payment of the loan of another, is a transfer without 'fair consideration.'" Opposition, at 11 (quoting *In re Chase & Sanborn Corp.*, 51 B.R. 739, 739 (Bankr. S.D. Fla. 1985) (quoting *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829 (5th Cir. 1959), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960)), and then makes the statements, ***unsupported by any reference to evidence in the record***, that (1) "[h]ere, the Debtors received no value for the [Bridge Loan] Transfer since the Defendant was not a creditor of the Debtors" (Opposition, at 11); (2) "there was no indirect benefit[31] to the Debtors from the transfer because the Debtors were not liable to the Defendant or to Granite for the debts at issue" (Opposition, at 13); and (3) "[t]here was no privity of contract between the Debtors and the Defendant, and any alleged debt between SCC and Granite was not enforceable . . . ." *Id.* The Trustee does not identify ***any*** record evidence with respect to ***any*** of these conclusory statements. In fact, nowhere in the whole of the Trustee's argument section of his Opposition, does the Trustee actually identify a single piece of summary judgment

---

[31] As noted above, the Trustee's citation to legal authority is incomplete and does not acknowledge that the proposition to which he cites—that using corporate assets to pay the loan of third person is without "fair consideration"—is only "usually" the case. The Trustee completely ignores the "indirect benefit" line of cases discussed above, that hold that the use of corporate assets to pay a loan of a third party can constitute a transfer in exchange for reasonably equivalent value where the debtor has received a benefit, directly or indirectly, as a result of the transaction.

evidence to support his claim that genuine issues of material fact exist that would preclude the entry of summary judgment in favor of the Wills Trust on this issue. A court should not have to sift through the record for evidence to support the Trustee's version of the facts at issue. *Hutton Communications*, 461 F.Supp.3d at 403 (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)). While the Trustee references summary judgment evidence in the "Factual Background" section of his Opposition, he does nothing to tie the record references to his assertion that SCC did not receive reasonably equivalent value in exchange for the Bridge Loan Transfer—an essential element of his constructive fraud claims.

The Trustee has failed to point to any summary judgment evidence that supports his theory that: (a) Granite made an equity investment in SCC of the Bridge Loan proceeds and, therefore, the Bridge Loan Transfer did not effect the satisfaction of an antecedent debt of SCC; or (b) that SCC did not otherwise receive a reasonably equivalent value in exchange for the Bridge Loan Transfer.[32] To recap, the summary judgment evidence was that:

- In October 2017, SCC was in the process of negotiating the terms of the Pharmacy Sale, to address cash flow concerns arising, primarily, from the Debtors increasingly aging accounts receivable.

- SCC needed short-term working capital to pay operating expenses, pending the closing of the Pharmacy Sale, and SCC solicited the various Bridge Lenders to make a bridge loan.

- To enhance the credit, SCC obtained Granite's agreement to support the loan, which resulted in the three-party bridge loan transaction whereby Granite borrowed funds from a Bridge Lender pursuant to secured promissory note that specifically stated that the purpose of the loan was to allow Granite to advance working capital to SCC.

---

[32] Again, the characterization of Granite's constructive advance of the Bridge Loan proceeds as an equity contribution and not a loan is irrelevant, as a matter of law, to the issue of whether SCC received a benefit in the three-party transaction that was reasonably equivalent in value to the Bridge Loan Transfer, where it is undisputed that SCC was the direct recipient of the Bridge Loan proceeds, and SCC used those proceeds in the operation of its business pending the Pharmacy Sale.

- The aggregate amount of the Bridge Loans advanced in October 2017 was $12.1 million.  All of the Bridge Lenders in the Related Avoidance Actions, other than the Wills Trust, participated in the October 2017 transaction and wired the proceeds of the Bridge Loan directly into SCC's account for SCC's use in the operation of its business, pending the Pharmacy Sale.

- In December 2017, the aggregate amount of the outstanding Bridge Loans increased to $15 million as a result of the Wills Trust advancing $5 million, two of the October 2017 Bridge Lenders being paid off by SCC in December, and the rest of the October 2017 Bridge Lenders extending the maturity date of their Bridge Loans to February 2018.  In December 2017, the Wills Trust wired the proceeds of its Bridge Loan directly to SCC's account for SCC's use in the operation of its business, pending the Pharmacy Sale.

- SCC's CFO testified that, in October 2017 and December 2017, SCC agreed to the repayment of the Granite loan on the terms set forth in the October 2017 and December 2017 SCC/Granite Notes and that each transaction would have been recorded in SCC's books and records as a "Note Payable" to Granite.

- The former officers and directors of SCC and Granite all testified that SCC was, in fact, indebted as a result of the Wills Trust's conduit loan which was expressly made for the benefit of SCC.

- The Disclosure Statement for the Plan described the transaction as "a series of . . . short-term high-interest bridge financing loans" that "the Company" entered into "with certain outside investors (the 'Outside Investors Notes') introduced through Granite."

The Trustee's citations to the record in the "Factual Background" portion of his Opposition do not raise a *genuine* issue of fact with respect to the reasonably equivalent value issue.  For example, the Trustee, in describing the three-party transaction, states, "Granite subsequently [after borrowing the $5,000,000 from the Wills Trust pursuant to the Granite/Wills Note] made equity injections into the Debtors"[33] and cites to deposition testimony of Mr. Rickard and Mr. Heller at Pl. Ex. E, Rickard 30(b)(6) Dep., 58:17-59:6, Appx. 429 and Pl. Ex. C, Heller Dep., 208:7-20, Appx. 314.  However, a review of the transcripts reveals that neither of the deposition excerpts cited by the Trustee support his conclusion that Granite made *equity* injections into the

---

[33] Opposition, 6.

Debtors after receiving the Bridge Loan proceeds from the Wills Trust.  Rather, Mr. Rickard's testimony merely stands for the proposition that Granite made "injections" into SCC; he did not state whether the injections were equity injections or debt injections and, in fact, during that same deposition, Mr. Rickard described Granite's constructive advances of the Bridge Loan proceeds to SCC as loans. *See* Def. Ex. D, Rickard 30(b)(6) Dep., 35:10-36:11, Appx. 69-70; *see also id.*, 115:20-116:11, Appx. 86-87.  And Mr. Heller's cited deposition testimony merely stands for the proposition that Granite had made an indirect "capital injection" into SCC "initially, up-front . . . through Silver Star," Pl. Ex. C, Heller Dep., 208:7-20, Appx. 314, and, in fact, the Trustee leaves out Mr. Heller's immediately following testimony that he did not recall "any other instances when [Granite] directly or indirectly made a capital injection or contribution to [SCC]." Pl. Ex. C, Heller Dep., 208:21-209-3, Appx. 314.  In describing the Bridge Loan Transfer to the Wills Trust, after making the allegation that Granite had made an equity contribution to SCC, the Trustee makes the following statement, "Although the Debtors, including SCC, were not legally obligated on the [Granite/Wills Note], and rather than Granite paying its debts under the [Granite/Wills Note] to [the Wills Trust], Granite directed SCC to make a gratuitous payment (the "Transfer") on February 5, 2018 in the amount of $5,221,232.88 in satisfaction of Granite's obligations to [the Wills Trust] under the [Granite/Wills Note]," citing only to Eric Wills' deposition testimony where he admits to having received the Bridge Loan Transfer from SCC in February 2018, a fact that the Wills Trust has never disputed. Opposition, 6.

*The Trustee's Argument that the Bridge Loan Was Not a "Permitted-Debt."*

The Trustee further mischaracterizes the summary judgment evidence offered in support of his allegation that "[t]he Transfer was not a Permitted Debt or Permitted Contingent Obligation,

as such terms are defined under the [CIBC] Credit Agreement."[34]  The Trustee cites deposition

testimony of Mr. Rickard, the Rule 30(b)(6) representative *of Granite,* in which he simply stated

that that the lender under the CIBC Credit Agreement with SCC "wouldn't permit an extension

of credit . . . in late 2017." Mr. Rickard further explained his answer by referring to SCC's use of

"their borrowing base to fund operations," and stating that he believed that SCC "had shortfalls

in short-term collections."  While the notion that either the SCC/Granite Note or the Granite/Wills

Note might have constituted debt that was not "Permitted Debt" and, thus, might triggered

covenant defaults under the CIBC Credit Agreement certainly seems plausible, the Trustee simply

presented no summary judgment evidence to support this notion.  Additionally, a covenant default

would not necessarily translate to a constructive fraudulent transfer.

### *The Trustee's Statute of Frauds Argument*

Despite the unrefuted summary judgment evidence that the constructive advance of the Bridge

Loan proceeds from Granite to SCC was *a loan,* the Trustee argues that this could not have created

indebtedness by SCC to Granite because any debt arising under the SCC/Granite Note and the

SCC/Granite Note itself were invalid and unenforceable at the time of the Bridge Loan Transfer

under the California statute of frauds.  Therefore, there could be no satisfaction of an antecedent

debt of SCC or reasonably equivalent value in exchange for the Bridge Loan Transfer.[35]  The

Trustee makes the factual statement that the SCC/Granite Note was unsigned at the time the

Bridge Loan Transfer was made, and, therefore, SCC could not be legally liable to Granite for the

amounts therein.  Consequently, "reasonably equivalent value was not received [by SCC] for the

---

[34] Opposition, at 6 (citing to one page of the Trustee's appendix—page 428—that contains deposition testimony of Mr. Rickard from his Rule 30(b)(6) deposition from page 55, lines 5-14).

[35] Opposition, 14 (quoting Cal. Civ. Code § 1624(a)(7) for the proposition that "[a] contract, promise, undertaking, or commitment *to loan money or to grant or extend credit*" is "invalid, unless [it], or some note or memorandum thereof, [is] in writing and subscribed by the party to be charged or by the party's agent.") (emphasis added).

[Bridge Loan] Transfer."[36]   Again, the Trustee ignores the indirect benefit rule, articulated in established Circuit-level precedent, that makes the nature of the advance from the original borrower to the debtor, in a three-party transaction such as this one, irrelevant in determining whether the debtor received reasonably equivalent value in exchange for the debtor's transfer to the original lender—especially when the original lender bypasses the original borrower in advancing the proceeds of the original loan directly to the debtor, who then makes use of the proceeds in the operation of its business prior to making a direct transfer of repayment to the original lender.

In any event, the Trustee's statute of frauds argument appears to be misplaced.  Even if there is a factual dispute as to whether the SCC/Granite Note was executed prior to the Bridge Loan Transfer, the promise at issue here – SCC's promise to Granite **to repay money that had already been loaned** would not be subject to the California statute of frauds.  And even if the statute of frauds applied to this type of promise or obligation, the obligation would not be rendered void or "unenforceable" but merely "voidable" prior to the partial or full performance of both Granite and SCC and not "voidable" at all by the Trustee **after** full performance under the terms of the SCC/Granite Note by Granite and SCC.  Moreover, "even if the full and part performance doctrine are ignored, an October 12, 2017 Email memorandum regarding documentation of the Granite to SCC loan [Def. Ex. E, Appx. 95] satisfied the California Statute of Frauds and is evidence of SCC's debt obligation."[37]   In any event, the Trustee's citations to the record of the deposition testimony of Mr. Kerr and to email correspondence in April of 2018 from Ms. Hallsey (of Granite) to Mr. Kerr, forwarding an October 26, 2017 email from Mr. Rickard to Mr. Kerr requesting Mr. Kerr to execute the attached "GIG-SCC Promissory Note GI-9009A 12M 10-5-

---

[36] *Id.*

[37] *See* Reply, 16.

17.docx," and noting that she was "unable to locate an executed copy of the attached note from October 2017," and further asking Mr. Kerr to "please execute and return . . . at your first opportunity," and, finally, simply noting that "[t]he accountants and auditors are asking for an executed copy," do not raise a *genuine* dispute of *material* fact as to the issue of whether SCC effected a satisfaction of an antecedent debt to Granite, as well as a satisfaction of Granite's debt to the Wills Trust under the Granite/Wills Note.

For all the reasons set forth above, this court recommends that the District Court *grant* the MPSJ as to the Trustee's constructive fraudulent transfer causes of action relating to the Bridge Loan Transfer (Counts I and IV) against the Wills Trust. The Trustee has failed to meet his burden of showing that there is a genuine dispute as to any material fact with respect to these claims. Thus, a judgment against the Trustee and in favor of the Wills Trust of no liability with respect to Counts I and IV relating to the Bridge Loan Transfer is proper.

2. *Actual Fraudulent Transfer Causes of Action Regarding Bridge Loan Transfer (Counts II and III)*

Now the court will analyze the Trustee's arguments that the Bridge Loan Transfer might have constituted an *actual* fraudulent transfer, as opposed to a *constructive* fraudulent transfer.

First, in Count II of the Complaint, the Trustee seeks to avoid the Bridge Loan Transfer, pursuant to Texas state law (section 24.005(a)(1) of TUFTA), as a transfer made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1). Whether a transfer was made with actual fraudulent intent is a fact question. *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. App.—Dallas 2007). Given that direct evidence of actual intent is rarely available, courts typically rely on circumstantial evidence, known as badges of fraud, to infer intent. *See In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008). TUFTA provides a non-exclusive list of badges of fraud that may be considered in determining actual intent on the part of a debtor.

*See* Tex. Bus. & Com. Code § 24.005(b) (stating "consideration may be given, ***among other factors***, to" the listed badges of fraud) (emphasis added).  The badges of fraud listed in the statute are:

1.  the transfer or obligation was to an insider;

2.  the retained possession or control of the property transferred after the transfer;

3.  the transfer or obligation was concealed;

4.  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5.  the transfer was of substantially all of the debtor's assets;

6.  the debtor absconded;

7.  the debtor removed or concealed assets;

8.  the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9.  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*

In addition to this state law actual fraudulent transfer argument, the Trustee also seeks, in Count III of the Complaint, to avoid the Bridge Loan Transfer pursuant to the Bankruptcy Code—i.e., Bankruptcy Code § 548(a)(1)(A).  Similar to TUFTA, § 548(a)(1)(A) of the Bankruptcy Code allows a trustee to avoid a transfer when a debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  But, unlike

TUFTA, the Bankruptcy Code does not set forth badges of fraud in the statute. However, the Fifth

Circuit has identified similar badges of fraud that may serve as evidence that a transfer was made

with actual intent to defraud:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Soza*, 542 F.3d at 1067.

Because the list is non-exhaustive, a court may consider other suspicious facts suggesting

that a transfer was made with actual fraudulent intent. *In re 1701 Commerce, LLC*, 511 B.R. 812,

836 (Bankr. N.D. Tex. 2014).  There is no clear authority on how many badges of fraud must be

present to sufficiently establish actual intent under either TUFTA or the Bankruptcy Code. *Tow v.

Speer*, Civ. Action No. H-11-3700, 2015 WL 1058080, *11 (S.D. Tex. 2015).  As a matter of law,

a finding of fraudulent intent cannot properly be inferred from the existence of just one "badge of

fraud." *Ingalls v. SMTC Corp.* (*In re SMTC Mfg. of Tex.*), 421 B.R. 251, 300 (Bankr. W.D. Tex.

2009).  "While a badge of fraud standing alone may amount to little more than a suspicious

circumstance, insufficient in itself to constitute a fraud per se, several of them when considered

together may afford a basis from which its existence is properly inferable," *United States v.

Fernon*, 640 F.2d 609, 613 (5th Cir.1981) (internal citations omitted), but "[n]ot all, or even a

majority, of the 'badges of fraud' must exist to find actual fraud." *Soza*, 542 F.3d at 1067 (quoting

*Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988)).  Courts in Texas have struggled

somewhat regarding just how many badges of fraud must exist to establish actual intent, although

generally two or three badges of fraud is regarded as insufficient.[38]  Courts "must consider all the factors and the 'totality' of the circumstances." *Tow*, 2015 WL 1058080, at \*11.

As with the Trustee's other causes of action, the Trustee bears the burden of proving the elements of his actual fraud claims, including the existence of a sufficient number of badges of fraud to infer fraudulent intent.  Defendant here has pointed to a lack of evidence in support of the Trustee's assertion that SCC made the Bridge Loan Transfer "with the actual intent to hinder, delay, or defraud" SCC's creditors by pointing to the overwhelming evidence in the record that SCC made the Bridge Loan Transfer in repayment of the bridge loan to Defendant in connection with its legitimate business objective of obtaining working capital to meet operating expenses, including payroll, pending the Pharmacy Sale at a time when it was unable to obtain the necessary working capital from CIBC under the CIBC Credit Agreement.  Thus, Defendant has met his initial burden as movant. To defeat Defendant's summary judgment motion, the Trustee must point to record evidence that shows the existence of a genuine issue of material fact with respect to whether SCC made the Bridge Loan Transfer with the actual intent to hinder, delay, or defraud—record evidence that would permit a reasonable jury to find in the Trustee's favor on this issue.  The Trustee has failed to meet this burden.

In arguing that Defendant is not entitled to summary judgment on Counts II and III of the Complaint, the Trustee fails to cite to a single piece of record ***evidence***, *see* Opposition, at 16-19, as was the case with his opposition to the entry of summary judgment in favor of Defendant on the constructive fraudulent transfer counts (Counts I and IV) regarding the Bridge Loan Transfer.

---

[38] *See, e.g.*, *1701 Commerce, LLC*, 511 B.R. at 841 (finding three badges of fraud insufficient to infer actual intent, two of which were insolvency and pending litigation badges); *Ingalls*, 421 B.R. at 300 ("Proof of four to five badges of fraud has been found sufficient in several reported cases," but where at most one badge of fraud can be found, that is insufficient to prove actual intent.); *Byman v. Denson* (*In re Edwards*), 537 B.R. 797, 808 (Bankr. S.D. Tex. 2015) (three badges of fraud not sufficient to prove actual intent under TUFTA); *Taylor v. Trevino*, No. 3:20-CV-393-D, 2021 WL 347566, at \*3 (N.D. Tex. Feb. 2, 2021) (fewer than four to five badges of fraud "may be insufficient to establish the existence of fraudulent intent").

While the Trustee does *recite* various badges of fraud from the TUFTA § 24.005(b) list that he asserts are present here, he does not cite any record *evidence* to support these badges of fraud (except for perhaps some on the badge of insolvency and the badge of "insider-ness"—see next section). And, as to his actual fraud claim pursuant to Bankruptcy Code § 548(a)(1)(A), he likewise fails to identify any *evidence* from which to make an inference to support his conclusory allegation that SCC made the Bridge Loan Transfer to Defendant with actual intent to hinder, delay, or defraud its creditors. Thus, the Trustee has not met his burden as nonmovant of pointing to record evidence of the existence of a genuine issue of material fact that would defeat Defendant's MPSJ as to the Trustee's actual fraud claims (Counts II and III) regarding the Bridge Loan Transfer. Accordingly, Defendant Wills Trust is entitled, under Rule 56, to judgment as a matter of law as to Counts II and III of the Complaint. The court recommends that the District Court grant Defendant's MPSJ and enter a judgment of no liability in favor of Defendant Wills Trust on the Count II and III actual fraud claims relating to the Bridge Loan Transfer.

   3.  *The More Vexing Question as to Whether the Bridge Loan Transfer to Wills Trust Might Have Been a Preferential Payment on an Antecedent Debt (Counts V and VI)*

The Bridge Loan Transfer occurred in February 2018—more than 90 days, but within one year, before the Petition Date (December 4, 2018). Might it be attacked as an "insider" preference—even if not as a constructive or actual fraudulent transfer?

In Counts V and VI of the Complaint, the Trustee seeks the avoidance of the Bridge Loan Transfer as an insider preference pursuant to either Texas state law—through Section 24.006(b) of TUFTA (the "TUFTA Preference Statute")—and/or pursuant to Bankruptcy Code § 547(b) (the "Bankruptcy Code Preference Statute").

The TUFTA Preference Statute provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an

*insider* for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." (Emphasis added.)

Similarly, the Bankruptcy Code Preference Statute provides that a trustee may avoid a transfer of property of the debtor that was made (1) "to or for the benefit of a creditor"; (2) "for or on account of an antecedent debt owed by the debtor before the transfer was made," (3) "while the debtor was insolvent," and (4) "between ninety days and one year before the filing of the petition, if such creditor at the time of such transfer was an *insider*."[39] (Emphasis added.)

The Wills Trust seeks summary judgment on Counts V and VI primarily on the basis that the Trustee has failed to offer record evidence in support of his allegation that the Defendant was an "insider" of SCC at the time of the Bridge Loan Transfer. The Wills Trust also seeks summary judgment on the TUFTA Preference Statute claim (Count V) on the additional ground that the Trustee has not pointed to any evidence that the Wills Trust had any knowledge of SCC's insolvency at the time of the Bridge Loan Transfer. Finally, the Wills Trust also seeks summary judgment on an affirmative defense raised in its Answer[40] to both Counts V and VI[41] that the Bridge Loan Transfer was made in the "ordinary course of business" or financial affairs of SCC and the Wills Trust.

Key to the analysis here is, what is an "insider" and is there a genuine dispute on this point that requires Counts V and VI to go to trial? The term "insider" can be characterized as either (1) a *statutory* insider (i.e., a person set forth in a list of examples in the Bankruptcy Code and TUFTA), or (2) a *non-statutory* insider (i.e., often more generically defined in case law as one who has a close relationship with the debtor such that it does not deal with the debtor at arms'

---

[39] Bankruptcy Code § 547(b)(2), (3), and (4)(B).

[40] *See* Answer ¶¶ 84 and 85.

[41] *See* TUFTA § 24.009(f)(2); Bankruptcy Code § 547(c)(2).

length). *In re Chapman*, 628 B.R. 512, 524 (Bankr. S.D. Tex. 2021); *see also Highland CLO*

*Funding, Ltd. v. Phelan (In re Acis Capital Mgmt., L.P.)*, 604 B.R. 484, 535 (N.D. Tex. 2019).[42]

A statutory insider is defined in Bankruptcy Code § 101(31), with respect to a corporation,[43] to

include "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi)

relative of a general partner, director, officer, or person in control of the debtor" as well as an

---

[42] Neither the Supreme Court nor the Fifth Circuit have specifically addressed the legal standard for determining non-statutory insider status, but the Supreme Court did acknowledge that, because the Bankruptcy Code's definition of the term "insider" uses the term "includes," "courts have long viewed its list of insiders as non-exhaustive" and that "[a]ccordingly, courts have devised tests for identifying other, so-called 'non-statutory' insiders." *U.S. Bank N.A. ex rel. CWCapital Asset Mgt. LLC v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 963 (2018)(cleaned up). The Supreme Court addressed the standard of review to be applied to the Ninth Circuit's determination that a creditor did not qualify as a non-statutory insider (while specifically ***not*** addressing the "correctness" of the Ninth Circuit's legal test for non-statutory insider status, noting it had "specifically rejected U.S. Bank's request to include that question in our grant of certiorari"). *Id.* at 965 (cleaned up).  And, Justice Sotomayor, in her concurring opinion (Sotomayor, J., concurring), did reference a Fifth Circuit opinion – *Matter of Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) – as an example of "[o]ther Circuits hav[ing] developed analogous rules" to the Ninth Circuit's conjunctive test for determining non-statutory insider status under which "[a] creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications [in the statute], ***and*** (2) the relevant transaction is negotiated at less than arm's length." *Village at Lakeridge*, 138 S.Ct. at 970 n.1 (and accompanying text) (Sotomayor, J., concurring).  As noted by Bankruptcy Judge Craig Gargotta in *In re Olmos Equip., Inc.*, 601 B.R. 412, 421 (Bankr. W.D. Tex. 2019), "there is a dearth of case law construing non-statutory insider status within the Fifth Circuit and other federal courts" and "there is no controlling definition of non-statutory insider in the Fifth Circuit because *Holloway* [which was referred to in *Village at Lakeridge*] "while instructive, was not a § 547 preference action, but a claim for relief under [TUFTA] § 24.006(b)." *Id.* at 420 (cleaned up).  Judge Gargotta did note that the Fifth Circuit in *Holloway*, "found that non-statutory status is reached when a transferee has a sufficiently close relationship with a debtor, which may be based on control or influence over the debtor, such that any dealings between the transferee and the debtor are not at arm's length," *id.* (cleaned up), having "examined the definition of insider under § 101(31) of the Bankruptcy Code and the related case law:  The cases which have considered whether insider status exists generally have focused on two factors in making that determination:  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *Id.* at 422 (citing *Holloway*, 955 F.2d at 1011 (internal citations omitted)).  The district court in *Acis Capital Mgmt.* affirmed this court's application of the two-factor test for non-statutory insider status, citing *Holloway* and stating that

> 11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor. A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances. In deciding whether a person is a non-statutory insider, the court considers two factors: '(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length.'

*Neutra, Ltd. v. Terry (In re Acis Capital Mgmt., L.P.)*, 604 B.R. 484, 535 (N.D. Tex. 2019)(citing *In re Holloway*, 955 F.2d at 1011).

[43] SCC is a limited liability company, which, for purposes of determining statutory insider status, is treated as a corporation. *See In re Heritage Org., L.L.C.*, 2006 WL 6508182, at *6 (Bankr. N.D. Tex. 2006).

"affiliate, or insider of an affiliate as if such affiliate were the debtor" and "[a] managing agent of the debtor."  TUFTA's list of statutory insiders is essentially coextensive with the list identified in Bankruptcy Code § 101(31). *See* TUFTA § 24.002(7)(B).  As noted above, courts have recognized the concept of an extra-statutory or non-statutory insider of a debtor as a person who is not listed in the statute but who has a sufficiently close relationship to the debtor such that any transactions between the two necessarily would not have been conducted at arms' length. *See Acis Capital Mgmt.*, 604 B.R. at 535 (citations omitted) ("In deciding whether a person is a non-statutory insider, the court considers two factors: '(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length.'").

The Wills Trust argues that there is no evidence in the record that the Wills Trust was a ***statutory*** insider—that the Wills Trust was either (1) a director of SCC, an officer of SCC, a person in control of SCC, a partnership in which SCC is a general partner, a general partner of SCC, or a relative of a general partner, director, officer, or person in control of SCC,[44] or (2) an affiliate of SCC or an insider of an affiliate of SCC by virtue of "directly or indirectly" owning twenty percent or more of the voting securities of SCC.[45]  The Trustee counters that he has pointed to record evidence that establishes that there is at least a genuine dispute of material fact as to whether the Wills Trust was a statutory insider by virtue of it being (1) a "person in control" of SCC under Bankruptcy Code § 101(31)(B)(iii), and/or (2) an "affiliate, or insider of an affiliate as if such affiliate were the debtor" pursuant §§ 101(31)(E), arguing that the Wills Trust was an affiliate of

---

[44] *See* MPSJ, at 24-25; Reply, at 20-21.

[45] The statutory definition of "insider" under both the Bankruptcy Code and TUFTA includes an affiliate of the debtor, or an insider of an affiliate of the debtor as if the affiliate were the debtor. Bankruptcy Code § 101(31)(E); TUFTA § 24.002(7)(D). Bankruptcy Code and TUFTA define "affiliate," in terms of owning equity in the debtor, as an entity that owns, directly or indirectly, twenty percent or more of the voting securities of the debtor. *See* Bankruptcy Code § 101(2)(A); Tex. Bus. & Com. Code § 24.002(1)(A).

SCC because it "directly or indirectly" owned twenty percent or more of the voting securities of SCC or at least an insider of Granite, which was clearly an insider and affiliate of SCC.

The Wills Trust also argues that the Trustee has failed to meet his burden of showing that there are genuine issues of material fact regarding whether the Wills Trust was a ***non-statutory*** insider of SCC—that the Wills Trust had a sufficiently close relationship with SCC such that a reasonable jury could infer that the Bridge Loan transaction was not conducted as an arms' length transaction.

*On the Issue of the Wills Trust's Insider Status Vis-à-vis SCC at the Time of the Bridge Loan Transfer*

As to the "insider" issue, the Trustee must point to record evidence that shows that there is at least a genuine dispute of material fact with respect to the issue of whether the Wills Trust was ***either*** a statutory insider ***or*** non-statutory insider of SCC at the time of the Bridge Loan Transfer. The Trustee argues that he has pointed to record evidence that shows that there are at least genuine issues of material fact regarding whether the Wills Trust was either (a) a ***statutory*** insider of SCC, by virtue of being (1) a "person in control" of SCC pursuant to Bankruptcy Code § 101(31)(B)(iii) ***and*** TUFTA § 24.002(7)(B)(iii) and (2) an "affiliate" of SCC at the time of the Bridge Loan Transfer; or (b) a ***non-statutory*** insider, because the Wills Trust had a sufficiently close relationship with SCC that could lead a reasonable jury to find that the Bridge Loan was not an arms' length transaction between the Wills Trust and SCC. Some of this evidence includes the following:  (a) the Wills Trust was the largest investor of SCC in terms of dollars invested ($2 million out of a total of $13.5 million, versus Silver Star's mere $1 million initial investment— although granted only a 4% voting interest in comparison to Silver Star's 75% voting interest at initial capitalization in 2009); (b) Eric Wills, who owned or controlled the Wills Trust, invested an additional $5 million in SCC through ERJMJ in a subsequent equity offering by SCC (in 2016)

(which then represented less than 2.3% of the total voting securities of SCC and diluted the Wills Trust's percentage ownership of SCC's voting securities from an original 4% to less than 3.7%; thus, in the aggregate, Wills Trust and ERJMJ had an approximately 6% voting interest in SCC in 2016); (c) the Wills Trust was the largest Bridge Lender and was able to negotiate a different collateral package to secure its Bridge Loan than was provided to the other Bridge Lenders (i.e., certain collateral items provided by Granite); (d) Eric Wills held, directly or indirectly, warrants in SCC's Class C units resulting from a 2009 loan, which were extended by SCC in 2018; and (e) Eric Wills was a significant investor in many Granite entities, some of which were Granite Landlords that leased nursing home facilities to SCC and also served on the SCC Oversight Committee for both SCC and the Granite Landlords.

The court has determined that, while the record evidence does not create a genuine dispute on the issue of whether the Wills Trust was a ***statutory*** insider of SCC, the Trustee has met his burden of showing that a genuine issue of material fact exists as to whether the Wills Trust's relationship with SCC was sufficiently close such that a jury could conclude that it was a ***non-statutory*** insider, and thus, could infer that the Bridge Loan Transfer was not arms' length as to it.

With regard to the lack of evidence regarding "statutory insiderness" and the Trustee's "affiliate" argument, Bankruptcy Code §§ 101(31)(E) and 101(2)(A) would require a showing that the Wills Trust was an "affiliate, or insider of an affiliate as if such affiliate were the debtor" by showing that the Wills Trust "directly or indirectly" owned 20% of the voting securities of SCC or was an insider of an "affiliate" – here, Granite. As noted above, the Trustee has pointed to record evidence that the Wills Trust, at initial capitalization, owned 4% of the voting securities of SCC and that, after the 2016 equity offering, its 4% interest was diluted to 3.6427% and that ERJMJ also invested in 2016, resulting in a 2.2767% ownership by ERJMJ of SCC's voting securities. Even if one were to combine the Wills Trust's ownership

with that of ERJMJ for insider status consideration (because the Wills Trust and ERJMJ are both owned or controlled by Eric Wills), their combined ownership of SCC's voting securities was less than 6%—far short of the threshold of ownership of 20% or more of voting securities of the debtor required to establish that the Wills Trust was a statutory insider of SCC by virtue of being an affiliate of SCC.  And, although the Trustee pointed to some evidence that Eric Wills may have invested in some Granite-related entities including some of the Granite Landlords, he has not pointed to any evidence that the Wills Trust was an insider of Granite in the face of evidence that (1) Eric Wills never had any responsibility for making any day-to-day decisions for Granite, (2) neither Eric Wills nor the Wills Trust has never served as an officer, manager, director, or employee of Granite, and (3) neither Eric Wills nor the Wills Trust had any direct or indirect ownership in Granite.

Moreover, the Trustee has not pointed to record evidence that would show that there is a genuine dispute as to whether the Wills Trust was statutory insider of SCC as a "person in control" within the meaning of Bankruptcy Code § 101(31)(B)(iii).  In order to be considered a "person in control" of a debtor under § 101(31)(B)(iii), the person must have had actual managerial control over the day-to-day operations of the debtor.  The existence of some ability of the creditor to exert some influence over transactions with the debtor in which the creditor has a direct stake does not rise to the level of "control" necessary for a finding that the creditor is a "person in control" within the meaning of the statute. *See Schubert v. Lucent Technologies Inc. (In re Winstar Communications, Inc.)*, 554 F.3d 382, 396, 396 n.5 (3d Cir. 2009)(where the Third Circuit agreed "that actual control (or its close equivalent) is necessary for a person or entity to constitute an insider under § 101(31)'s 'person in control' language," noting that the bankruptcy court had correctly applied that standard when it stated, "There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a

direct stake.")(cleaned up). The Third Circuit noted that the alleged insider's citation to a Fourth

Circuit case, citing *Hunter v. Babcock (In re Babcock Dairy Co.)*, 70 B.R.662, 666 (Bankr. N.D.

Ohio 1986), supported a finding in the statutory "person in control" context that actual control of

the debtor's business operations is required. *Id.* at 395-396.  In *In re Babcock Dairy*, the bankruptcy

court held, in the context of its "person in control" insider analysis, that "[although no] standard

has been established for determining the degree to which a person must control a debtor before he

is considered an insider it does appear that the person must exercise sufficient authority over the

debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Id.*

at 395 (quoting *In re Babcock Dairy*, 70 B.R. at 666)(cleaned up).

Notably, the Third Circuit held that ***the same cannot be said for determining non-statutory***

***insider status***:  "a finding of [actual control] is not necessary for an entity to be a non-statutory

insider." *Id.* at 396 (quoting *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d

1272, 1279 (10th Cir. 2008) ("A finding of actual control by the bankruptcy court would make

Creditor a statutory insider and would avoid the question of whether it was a non-statutory insider

altogether. Obviously, then a bankruptcy court does not have to find actual control of the debtor

by the creditor before ruling that the creditor is a non-statutory insider of the debtor")).  The Third

Circuit stated that "[t]o hold otherwise would render meaningless Congress's decision to provide

a non-exhaustive list of insiders in [§ 101(31)(B)] because the 'person in control' category would

function as a determinative test." *Id.* at 396.[46]  Thus, the test for a non-statutory insider status does

not include a requirement that the alleged insider be shown to have had actual control over the

---

[46] *See also id.* at 396 (quoting *In re U.S. Med.* 531 F.3d at 1277 n.5, "The 'control' to which [non-statutory insider]
cases refer can only correctly be interpreted as something short of actual, legal control over the debtor's business
because 'actual control' would subject the creditor to the statutory category of 'person in control of the debtor' under
[§ 101(31).]  Any interpretation of 'control' within the nonstatutory-insider context as anything like the ability to
'order, organize or direct' the debtor's operations is simply incorrect.").

debtor's managerial decisions and business operations; rather, it requires only a showing that there was a ***sufficiently close relationship between the alleged insider and the debtor such that the creditor's dealings with the debtor were not conducted at arms' length***.

The court concludes that the Trustee's summary judgment evidence regarding Eric Wills' dealings with SCC and with Granite shows that there are genuine disputes over material facts on the issue of whether the Wills Trust was a ***non-statutory insider*** of SCC or Granite. Therefore, the Trustee has met his burden to defeat the Wills Trust's MPSJ as to the issue of its insider status—non-statutory here—vis-à-vis SCC.

<u>*On the Issue of Whether the Wills Trust Had Reasonable Cause to Believe That SCC Was Insolvent at the Time of the Bridge Loan Transfer*</u>

As noted, with respect to the Trustee's Count V under the TUFTA Preference Statute, he would have the burden of proving at trial not only that the Wills Trust was an insider of SCC, but also that the Wills Trust would have had reasonable cause to believe that SCC was insolvent at the time of the Bridge Loan Transfer. The court concludes that the same summary judgment evidence that shows there is a genuine issue of material fact as to whether the Wills Trust had a sufficiently close relationship with SCC such that a jury could infer that the Bridge Loan Transaction was not an arms'-length transaction also shows that there are genuine disputes regarding whether the Wills Trust would have had reasonable cause to believe that SCC was insolvent at the time of the Bridge Loan Transfer. Thus, the Trustee has met his burden as nonmovant of defeating the Wills Trust's MPSJ as to this element of his state-law insider preference claim.

<u>*On the Wills Trust's "Ordinary Course of Business" Affirmative Defense*</u>

As to the Wills Trust's "ordinary course of business" affirmative defense—with respect to which the Wills Trust would bear the burden of proof at trial—the Wills Trust has not "establish[ed] beyond dispute all of the defense's essential elements" as would be required for it

to be entitled to summary judgment on this issue.[47]  Section 547(c)(2) of the Bankruptcy Code

provides that a transfer is ***not*** subject to avoidance as a preference

> to the extent that such transfer was in payment of a debt incurred by the debtor in
> the ordinary course of business or financial affairs of the debtor and the transferee,
> and such transfer was –
>
> > (A) made in the ordinary course of business or financial affairs of the debtor
> >       and the transferee; or
> > (B) made according to ordinary business terms.

"As an affirmative defense, the burden of proof rests upon the Defendant and whether or not a

payment is made in the ordinary course of business and according to ordinary business terms is a

factual determination." *In re ACP Ameri-Tech Acquisition, LLC*, No. 09-90082, 2012 WL 481582,

*7 (Bankr. E.D. Tex. Feb. 14, 2012)(cleaned up). Thus, "the general rule is that the ordinary course

of business defense cannot be determined on a motion for summary judgment." *Id.* (quoting *In re*

*Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Co. (In re Ice Cream Liquidation, Inc.)*,

320 B.R. 242, 250 (Bankr. D. Conn. 2005)).  Here, the Wills Trust has not met its burden of

pointing to record evidence that establishes beyond dispute that the Bridge Loan Transfer was

made under circumstances and under terms that would meet the requirements of the ordinary

course of business exception under Bankruptcy Code § 547(c)(2).  The Wills Trust's conclusory

statement in its motion that there is evidence that "the debt SCC owed to Granite and by extension

to Wills Trust was paid when it was due as agreed by the parties" and, therefore, was "a payment

made in the ordinary course of business" does not meet its initial burden as movant here to show

that there is no dispute with respect to its ordinary course defense.

---

[47] *See Soto v. William's Truck Service, Inc.*, Civ. A. No. 3:11-cv-3242-B, 2013 WL 487070, *1 (N.D. Tex. Feb. 8, 2013)(quoting *Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006)(citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)); *see also In re Central Louisiana Grain Co-op., Inc.*, 497 B.R. 229, 235 (Bankr. W.D. La. 2013)("The ordinary course exception is an affirmative defense, so [movant] has the burden of persuasion as to each element of the defense.").

The Trustee argues that the ordinary course of business defense does not apply here because the Bridge Loan transactions were part of "a highly unusual transaction" involving a tripartite relationship in which Granite borrowed money from the Bridge Lenders only to then "inject" it into SCC and that "the debt was incurred while the Debtors were in dire financial straits and as a bridge to the Pharmacy sale."[48]   The court agrees with the Trustee that there is at least a genuine dispute of material fact with respect to whether the Bridge Loan itself and the Bridge Loan Transfer to the Wills Trust were made in the ordinary course of business between SCC and the Wills Trust and, certainly whether the Bridge Loan Transfer was made according to ordinary business terms such that the Wills Trust would be protected from avoidance under the ordinary course of business defense to the Trustee's preference causes of action.

The court concludes that the Wills Trust has not met its burden of proving that there are no genuine issues of material fact such that it is entitled to a judgment as a matter of law with respect to the Trustee's preference causes of action in Counts V and VI and, thus, recommends that the MPSJ be denied as to Counts V and VI of the Complaint.

## IV.    Defendants' Motion to Dismiss for Lack of Standing/Subject Matter Jurisdiction Trustee's Avoidance Causes of Action (Counts I-IV) with respect to Dividend Transfers

### A.  The Dividend Transfers

Between December 30, 2015 and March 31, 2018, SCC made ten quarterly dividend payments to each of the Defendants, on account of their respective Class A membership interests in SCC, that the Trustee seeks to avoid as fraudulent transfers in Counts I through IV.  These Dividend Transfers are set forth in the table below:

| Quarter | Date | Wills Dividend | ERJMJ Dividend |
|---------|------|----------------|----------------|
| Q4 2017 | 03/31/2018 | $49,315.08 | $123,287.69 |
| Q3 2017 | 12/29/2017 | $44,969.03 | $112,422.57 |

---

[48] *See* Opposition, 24.

| | | | |
|---|---|---|---|
| Q2 2017 | 09/29/2017 | $44,969.03 | $112,422.57 |
| Q1 2017 | 06/30/2017 | $44,969.03 | $112,422.57 |
| Q4 2016 | 03/31/2017 | $22,230.96 | $55,577.39 |
| Q3 2016 | 12/30/2016 | $19,619.44 | $49,048.59 |
| Q2 2016 | 09/29/2016 | $19,406.18 | $48,515.46 |
| Q1 2016 | 06/30/2016 | $19,406.18 | $48,515.46 |
| Q4 2015 | 03/30/2016 | $19,619.44 | $49,048.59 |
| Q3 2015 | 12/30/2015 | $19,619.44 | $49,048.59 |
| | **Total** | **$304,123.80** | **$760,309.46** |

To be clear, the Trustee seeks to avoid these Dividend Transfers as either constructive or actual fraudulent transfers.

On June 20, 2023, Defendants Wills and ERJMJ together filed a *Motion to Dismiss for Lack of Subject Matter Jurisdiction* and brief in support [Adv. Dkt. Nos. 75, 76], seeking dismissal of all fraudulent transfer claims against them with respect to the Dividend Transfers. Specifically, the Defendants argue that the Trustee lacks standing to bring the fraudulent transfer claims with regard to the Dividend Transfers because, unlike the claims relating to the Bridge Loan Transfer, they were not adequately retained, preserved, or transferred to the Trustee under the terms of the confirmed Plan or by the Confirmation Order and, therefore, the court lacks subject matter jurisdiction over these claims, such that they should be dismissed with prejudice. The Trustee counters that the claims relating to the Dividend Transfers were sufficiently retained, preserved, and transferred to the UCT as UCT Avoidance Actions and that they did not constitute Waived Avoidance Actions under the terms of the Plan that would have been released as of the effective date of the Plan.

The Fifth Circuit has issued several opinions in this same context—specifically, regarding **post-confirmation standing** of a party to assert a former chapter 11 debtor's avoidance or other causes of actions after the effective date of a plan. The question usually posed is whether, under the terms of a confirmed chapter 11 plan, a cause of action was retained and transferred such that

the plaintiff (whether it be the reorganized debtor, a litigation trustee, or some other party) was conferred with constitutional standing to prosecute those causes of action post-confirmation.  In its 2008 opinion in *In re United Operating, LLC*, 540 F.3d 351 (5th Cir. 2008), the Fifth Circuit addressed the jurisdictional issue of whether the reorganized debtor, which survived as a shell company after confirmation of the debtor's chapter 11 plan, had standing to bring post-confirmation causes of action against a creditor and other parties for mismanagement of the estate during the reorganization.  The Fifth Circuit explained that the debtor, as debtor-in-possession, had all of the powers of a trustee to pursue claims on behalf of the estate, but, upon confirmation of a plan, the estate ceased to exist, and the reorganized debtor "lost its status as debtor 'in possession'" and its "authority to pursue claims as though it were a trustee also expired." *Id.* at 355.  The court noted, though, that the Bankruptcy Code allows a reorganized debtor to bring a post-confirmation cause of action that had belonged to the debtor's estate only if the debtor has preserved its standing to bring such a claim under the terms of a plan that "expressly provided for the claim's 'retention and enforcement by the debtor.'" *Id.* (citing Bankruptcy Code § 1123(b)(3)(B)).  Thus, "[a]fter confirmation of a plan, the ability of the [debtor] to enforce a claim once held by the estate is limited to that which has been retained in the plan." *Id.* (citations omitted). In order for a debtor to preserve a claim, the reservation under the plan must be "specific and unequivocal." *Id.* (cleaned up).  The court explained,

> If a debtor has not made an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved.  This is a logical consequence of the nature of a bankruptcy, which is designed primarily to secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time. To facilitate this timely, comprehensive resolution of an estate, a debtor must put its creditors on notice of any claim it wishes to pursue after confirmation. Proper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it—absent "specific and unequivocal" retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote.

*Id.* (cleaned up).  The court in *In re United Operating* determined that "[n]either the Plan's blanket reservation of 'any and all claims' arising under the Code, nor its specific reservation of other types of claims under various Code provisions are sufficient to preserve the common-law claims [the reorganized debtor] now brings for, *inter alia*, fraud, breach of fiduciary duty, and negligence," further stating,

> If Dynasty had wanted to bring a post-confirmation action for maladministration of the estate's property during the bankruptcy, it was required to state as much clearly in the Plan. Had that been the case, the creditors could have reviewed the possible impact of future litigation on their claims and liabilities before voting to confirm the Plan.  As it happened, Dynasty did not preserve those claims. The Plan has been confirmed and substantially consummated; the estate no longer exists. Dynasty is without standing to assert these claims.

*Id.* at 356 (citations omitted).  Thus the problem in *United Operating* was a reservation of claims such as avoidance actions, arising under the Bankruptcy Code, but not common law claims.

Three years later, in *Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Texas Wyoming Drilling, Inc.)*, 647 F.3d 547 (5th Cir. 2008), the Fifth Circuit added in again on this post-confirmation standing issue and held that "courts may consult the disclosure statement in addition to the plan to determine whether a post-confirmation debtor has standing."  The court pointed out that its holding was "consistent with the purpose of *In re United Operating's* [specific and unequivocal reservation] requirement:   placing creditors on notice of the claims the post-confirmation debtor intends to pursue," *id.* at 551 (citing *In re United Operating*, 540 F.3d at 355), having noted earlier in its opinion the purpose behind *In re United Operating's* rule:

> The purpose of the rule is to put "creditors on notice of any claim [the debtor] wishes to pursue after confirmation" and enable "creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it." *Id.*  "[A]bsent specific and unequivocal retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote." *Id.* (internal quotation marks omitted).

*Id.* at 550 (quoting *In re United Operating*, 540 F.3d at 355).   In *In re Texas Wyoming Drilling*, the reorganized debtor had sued thirty-two of its former shareholders for avoidance of pre-petition dividend payments as fraudulent transfers under TUFTA and the Bankruptcy Code.  *Id.* at 549. Laguna Madre Oil & Gas II, L.L.C. and various other defendants had filed a motion for summary judgment in the bankruptcy court, arguing that the reorganized debtor did not have standing to pursue the claims against them because the reorganized debtor's plan had not adequately retained them. *Id.*  The bankruptcy court converted the chapter 11 case to one under chapter 7 the day before it heard the defendant's motion and, thus, the chapter 7 trustee succeeded the reorganized debtor as the plaintiff in the action.  The bankruptcy court then denied the defednants' motion. *Id.*

The debtor's plan in *Wyoming Drilling* had called for the retention of certain causes of action, including "Estate Actions," which was defined to include claims under Chapter 5 of the Bankruptcy Code, and the disclosure statement provided that the debtor "reserves all rights to pursue . . . any Estate Actions not limited to but including any preference [actions and] actions under [Bankruptcy Code §§ 542 and 549]." *See id.*  The disclosure statement also defined "Estate Actions" to include "various potential avoidable transfers that can be recovered under Chapter 5" and included a chart outlining "various claims and causes of action the Debtor or the Reorganized Debtor may pursue on behalf of the Debtor's estate" which listed "[v]arious pre-petition shareholders of the Debtor" who might be sued for "fraudulent transfer and recovery of dividends paid to shareholders." *Id.*  The Fifth Circuit noted that it "need not decide whether a debtor whose plan fails to identify *any* prospective defendants has standing to pursue post-conformation claims against subsequently named defendants" because "[h]ere, the disclosure statement *did* identify the prospective defendants as '[v]arious prepetition shareholders of the Debtor' who might be sued for 'fraudulent transfer and recovery of dividends paid to shareholders.'" *Id.* at 552.  The Fifth Circuit went on to hold that "where the plan and disclosure statement reserved the right to pursue

the Avoidance Actions against pre-petition shareholders of [the debtors], the reorganized debtor specifically and unequivocally retained these claims under *In re United Operating*" and "[t]he trustee therefore has standing to pursue the Avoidance Actions." *Id.*

The following year, in *Compton v. Anderson (In re MPF Corp., Ltd.)*, 701 F.3d 449 (5th Cir. 2012), the Fifth Circuit provided still more clarification regarding the meaning of "specific and unequivocal" reservations in chapter 11 plans, in an appeal of a bankruptcy court's dismissal based on lack of standing in post-confirmation adversary proceedings brought by a trustee for a litigation trust established by a debtor's plan.  In *MPF Corp.*, the debtor's plan described claims that would be reserved to a litigation trustee, providing in relevant part that "all Causes of Action, including but not limited to, (i) any Avoidance Action that may exist against any party identified on Exhibits 3(b) and (c) of the Debtors' statements of financial affairs ... shall be transferred to the Litigation Trustee" and defining "Avoidance Actions" as "any and all actual or potential claims or Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including §§ 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, and 742(a)." *See id.* at 452. Section 4.03 of the Plan specifically excluded "any Cause of Action released in connection with or under the Plan or by prior order of the Court" from the scope of reserved claims." *Id.*  Certain defendants who were sued by the litigation trustee, each of whom were listed on Exhibits 3(b) and 3(c) of the debtors' statement of financial affairs, filed a "motion to enforce[e] the terms of the confirmation order" and dismiss the avoidance actions brought against them, primarily on the grounds that they had been released under the terms of the plan. *Id.*  The bankruptcy court raised, *sua sponte*, the issue of whether the plan's reservation language with respect to the Avoidance Actions met the "specific and unequivocal" reservation rule of *United Operating*, and after supplemental briefing, "found that the reservation language in the Plan did not meet the 'unequivocal' requirement . . . and was therefore ineffective to reserve

any causes of action to the Litigation Trustee." *Id.* The bankruptcy court found that the plan was insufficiently unequivocal "because it reserved avoidance actions that 'may exist' against the parties identified on Exhibits 3(b) and 3(c), rather than avoidance actions that 'do exist and will be prosecuted'" and, that because the plan provided that released causes of action were not being preserved, "the reservation language was ambiguous and therefore equivocal." Thus, the bankruptcy court dismissed for lack of standing every adversary proceeding filed by the Litigation Trustee. *Id.* at 452-453.

The Fifth Circuit rejected a view of the bankruptcy court that *United Operating* required that "the parties to be sued after confirmation must be individually identified," as well as its view that a plan must state that the individually named defendants "*will be sued*—not that they *may be sued* or *could be sued* or *might be sued.*" These notions had been specifically rejected by the Fifth Circuit in *Texas Wyoming*. *Id.* at 455. The Fifth Circuit also found error in the bankruptcy court's conclusion that certain ambiguity in the plan's language releasing certain causes of action required a finding that "the plan *per se* fails to make a specific and unequivocal reservation." *Id.* The Fifth Circuit stated,

> [i]f a court applies contract interpretation principles and finds that the only reasonable interpretation of the Plan is that certain parties were released, that would not render the reservation insufficiently specific and unequivocal. Instead, it would mean that claims against those parties fall outside the scope of the reservation. Thus, irrespective of whether an ambiguity *per se* renders a reservation equivocal, the bankruptcy court erred in its finding that the reservation language was ambiguous.

*Id.* at 457. The court remanded to the bankruptcy court "for further consideration of the Litigation Trustee's standing consistent with this opinion." *Id.*

Turning, now to this Action, both Defendants argue that the Plan did not specifically and unequivocally reserve the claims against them pertaining to the Dividend Transfers—i.e., they did not fall within the category of claims that were reserved under the Plan and, thus, were released as

of the Effective Date as "Waived Avoidance Actions" per the terms of the Plan.    Therefore, the Trustee does not have standing to bring, and this court does not have subject matter jurisdiction to consider, them. The Trustee, on the contrary, argues that the claims pertaining to the Dividend Transfers constitute "UCT Avoidance Actions" that were specifically and unequivocally reserved under the terms of the Plan.

_Were the Claims Pertaining to the Dividend Transfers "Specifically and Unequivocally" Reserved Under the Terms of the Plan and Disclosure Statement?_

Having considered the language of the Plan (including, but not limited to, its reservation language), and the arguments of the parties, the court finds that the claims pertaining to the Dividend Transfers against these pre-petition equity holders were not "specifically and unequivocally" reserved under the Plan for prosecution by the Trustee on behalf of the UCT post-confirmation.  Thus, the Trustee does not have standing to bring, and this court does not have subject matter jurisdiction over, the Dividend Transfer claims.

As noted above, the Wills Trust does not dispute that the claims asserted against it by the Trustee for the avoidance and recovery of the ***Bridge Loan Transfer*** were adequately reserved under the terms of the Plan, such that the Trustee has standing to bring such claims.  The Debtors' causes of action against the Wills Trust as a Bridge Lender and the specific dollar amount of the Bridge Loan Transfer were explicitly identified in the Plan Supplement filed on November 19, 2019,[49] as among the UCT Avoidance Action(s) that were reserved by the Debtors and transferred to the UCT pursuant to Article VI(E) of the Plan. But—to the contrary—the Trustee's claims pertaining to the Dividend Transfers were not explicitly identified in the Plan, Disclosure Statement, or Plan Supplement by type, transfer amount, or transferee.

---

[49] *See* Bankr. Dkt. No. 2219, Exhibit K Schedule of Unsecured Creditor Trust Causes of Action, at 176-177, 182.

With respect to the Debtors' reservation of causes of action under the terms of the Plan—

and as noted in a section of the bankruptcy court's Confirmation Order entitled "<u>Retention of</u>

<u>Causes of Action (11 U.S.C. § 1123(b)(2))</u>": "[t]he Plan reserves and preserves the Debtors' rights,

claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that

the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves

in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law"

and  "[t]he ***Unsecured Creditor Trust Causes of Action*** are reserved and preserved pursuant to

the Plan, the Disclosure Statement, and the Plan Supplement."[50]  Additionally, Article VI(E) of

the Plan, entitled "Vesting of Assets," provides for the reservation by the Debtors, and transfer to

the UCT, of the "Unsecured Creditor Trust Causes of Action" and specifically includes the

following reservation language, identifying a list of potential defendants either individually by

name or by generic category:

> The Unsecured Creditor Trust and the Unsecured Creditor Trustee reserve any and
> all ***Unsecured Creditor Trust Causes of Action***, whether such Unsecured Creditor
> Trust Causes of Action arose before, on or after the Petition Date, the Confirmation
> Date, the Effective Date, the Record Date and/or any Distribution Date, including,
> without limitation, those ***Unsecured Creditor Trust Causes of Action*** that the
> Debtors, the Unsecured Creditor Trustee, or the Unsecured Creditor Trust may have
> against (a) any D&O Liability Insurance Policies; (b) the Debtors' prepetition
> officers and directors, [footnote omitted] including, without limitation, Andrew
> Kerr, Michael Brandley and the officers and directors identified in the Disclosure
> Statement or the Plan Supplement; (c) payments to the Debtors' officers, directors,
> and senior management and the relatives of the Debtors' officers, directors and
> senior management prior to the Petition Date, including, without limitation, those
> persons and payments identified in the Debtors' schedules of assets and liabilities,
> the Disclosure Statement or the Plan Supplement; (d) Granite, (e) Silver Star, (f)
> PharMerica and/or the PharMerica Funds; (g) any Insiders; (h) those persons repaid
> for "bridge loans" or "payday loans" prior to the Petition Date, including, without
> limitation, those persons identified in the Debtors' schedules of assets and
> liabilities, the Disclosure Statement or the Plan Supplement; (i) the Debtors'
> prepetition Professionals, [footnote omitted] including, without limitation, BDO

---

[50] Confirmation Order, III(S)(12) (emphasis added).

and the Debtors' accounting firm BKD; and (j) any contempt claims relating to or arising under the Contempt Motion.[51]

Article VI(E) further specifically stated that "Except as specifically set forth herein, the Unsecured Creditor Trustee shall constitute the representative of the Estates for purposes of retaining, asserting and/or enforcing the **Unsecured Creditor Trust Causes of Action** under Bankruptcy Code section 1123(b)(3)(B)." (emphasis added). Thus, it would seem that the claims pertaining to the Dividend Transfers would have been reserved under the language of the Plan if: (a) those claims can be said to have been specifically and unequivocally identified as "Unsecured Creditor Trust Causes of Action," **and** (b) the Defendants fall within any of the categories (a)-(j) of potential defendants.

So how is the term "**Unsecured Creditor Trust Causes of Action**" defined in the Plan? It is defined to mean "any Cause of Action that is neither a **Waived Avoidance Action** nor a **Retained Cause of Action** . . . , including, without limitation, any Cause of Action listed on the **Schedule** of Unsecured Creditor Trust Causes of Action, those Causes of Action described in **Article VI.E**, those Causes of Action **described in the Disclosure Statement**, . . . and the Unsecured Creditor Trust **Avoidance Actions**."[52] The term "Waived Avoidance Action" is defined in the Plan to mean "an Avoidance Action that is not an Unsecured Creditor Trust Avoidance Action,"[53] and the term "Unsecured Creditor Trust Avoidance Action" is, in turn, defined as[54]

> an Avoidance Action or other Cause of Action against one or more of the following Persons: (a) Granite, (b) Silver Star, (c) an Insider, (d) PharMerica and the PharMerica Fund, (e) those Persons identified in the Disclosure Statement and/or a schedule to be included in the Plan Supplement as potential targets of Causes of Action, and (f) those Professionals employed Prepetition who are not Released Parties.

---

[51] Plan, 35-36 (emphasis added).

[52] *Id.* at 17.

[53] *Id.* at 18.

[54] *Id.* at 17.

The Plan also provides, with respect to "Waived Avoidance Actions," that "[n]otwithstanding anything in the Plan to the contrary, on the Effective Date, all Waived Avoidance Actions shall be waived and released by the Debtors and the Reorganized Debtors and their Estates."[55]

Suffice it to say that one is required to do a lot of "flipping" through pages and defined terms to sort through the "standing" quandary pertaining to the Dividend Transfers.  In doing this "flipping" exercise, the court must be ever-mindful of the Fifth Circuit's directives in *United Operating*, *Texas Wyoming*, and *MPF Corp.*, that a "specific and unequivocal" reservation under the terms of a plan (and disclosure statement) is necessary so that parties are put on notice of the debtor's reservation of claims that may be prosecuted post-confirmation.  The Trustee argues that the fraudulent transfer claims pertaining to the Dividend Transfers paid to the Wills Trust and ERJMJ were specifically and unequivocally reserved as "causes of action for fraudulent and avoidable transfers against ***Insiders***."[56]  Here, the term ***"Insiders"*** is capitalized, because the Plan called for the reservation of certain causes of action ***not against lower case "insiders"*** but against ***"Insiders,"***[57] a term specifically defined under the Plan to mean "an 'insider,' ***as defined in Bankruptcy Code section 101(31)***."[58]  This is critical.  Recall the earlier discussion herein of ***statutory*** insiders versus ***non-statutory*** insiders.  The Debtors and the UCC, who drafted and proposed the Plan, Disclosure Statement, and Plan Supplement, and who were represented by sophisticated bankruptcy counsel who most assuredly were aware of the concept of ***non-statutory insiders***, chose to limit the meaning of the term "Insider" to its statutory definition as defined in

---

[55] *Id.* at 42.

[56] MTD Response, 4-5.

[57] *See* Plan, Art. VI(E)(g), 36 and Plan, 17 (category "(c)" of potential defendants identified in the definition of "Unsecured Creditor Trust Avoidance Action").

[58] Plan, 10 (emphasis added).

Bankruptcy Code § 101(31). And, as the court has earlier noted herein, in connection with the Wills Trust's MPSJ, there is no evidence that the Defendants here were ***statutory insiders*** of SCC.

In addition to this ***"Insider"*** versus ***"insider"*** problem, the SCC Plan makes no specific reference to reserving dividend transfer avoidance causes of action and does not identify pre-petition equity holders, either individually or as a category of potential defendants, against whom avoidance of pre-petition dividend payments would be sought. Contrast this with: (a) the reservation language that the Fifth Circuit found to be adequate in *Texas Wyoming*, that listed "[v]arious pre-petition shareholders of the Debtor" who might be sued for "fraudulent transfer and recovery of dividends paid to shareholders," and (b) the Plan's specific and unequivocal reservation language regarding claims against ***the Bridge Lenders*** for avoidance of the ***Bridge Loan Transfers*** that identified specific amounts of Bridge Loan Transfers made to specifically named Bridge Lenders, such that all parties were clearly put on notice that ***the Debtors' claims against the Bridge Lenders for avoidance of the Bridge Loan Transfers*** (regardless of whether the Beidge Lender defendants were statutory insiders, non-statutory insiders, or neither) were being reserved and transferred to the UCT for prosecution post-confirmation.

As noted earlier, there were multiple Defendants sued by the Trustee in his eleven different Related Avoidance Actions that were ***both*** Bridge Lenders and holders of Class A membership interests in SCC. But, for reasons that are unclear, the Wills Trust is the only Defendant (of those wearing these dual hats) against whom the Trustee is seeking the avoidance and recovery of Dividend Transfers. The Trustee's own summary judgment evidence identifies at least five other Bridge Lender defendants in the Related Avoidance Actions who owned Class A membership interests in SCC.[59] There is no mention at all of the Defendant ERJMJ in the Plan, Disclosure

---

[59] *See* Pl. Ex. D, Rickard Dep., Appx. 408-409.

Statement, or Plan Supplement.  The Wills Trust is mentioned by name, but only on Exhibit K of the Plan Supplement, where it is listed as the recipient of a "Bridge Loan Payment" in the exact amount of the Bridge Loan Transfer that the Trustee seeks to avoid in this Action.

For all these reasons, the court finds that the reservation language in the Plan, Disclosure Statement, and Plan Supplement did not constitute a "specific and unequivocal" reservation of the avoidance claims against Wills Trust or ERJMJ pertaining to the Dividend Transfers.  As such, the claims pertaining to the Dividend Transfers were not preserved for prosecution by the UCT post-confirmation.  Thus, the Trustee lacks standing to bring, and this court lacks subject matter jurisdiction over, the claims pertaining to the Dividend Transfers asserted by the Trustee against the Wills Trust and ERJMJ in Counts I through IV of the Complaint.

### V.    Recommendation to the District Court Regarding the MPSJ and the MTD

For the reasons set forth herein, the bankruptcy judge recommends that the District Court:

(1) **grant in part** the Wills Trust's motion for partial summary judgment, determining that the Wills Trust has **no liability** with respect to the Trustee's causes of action in Counts I-IV, for avoidance and recovery of the Bridge Loan Transfer **as a fraudulent transfer** of any kind, and enter judgment against the Trustee and in favor of the Wills Trust on these Counts;

(2) **deny in part** the Wills Trust's motion for partial summary judgment, determining that, with respect to the Trustee's **insider preference causes of action** relating to the Bridge Loan Transfer, in Counts V and VI, the Wills Trust has not met its burden of showing there do not exist genuine issues of material fact such that it is entitled to judgment as a matter of law—thus the preference counts should go to trial;

(3) *grant* Defendants' Motion to Dismiss the Trustee's causes of action asserted in Counts I
through IV of the Complaint, that seek to avoid and recover *the Dividend Transfers* as
fraudulent transfers under state law and the Bankruptcy Code, on the basis that the Trustee
*does not have standing to bring, and the court lacks subject matter jurisdiction over*, such
claims.

In summary, the bankruptcy court is proposing that *the only counts in this Action that should
survive and go to trial are the preference counts (Counts V and VI) pertaining to the Bridge
Loan Transfer made to the Wills Trust*.

### End of Report and Recommendation ###